STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION v. TIDEWATER NATURAL GAS COMPANY AND CITY OF ROCKY MOUNT.

(Filed 14 June 1963.)

**1. Utilities Commission § 6—**

A proceeding in which a utility seeks an increase in rates for classes of customers providing its major source of revenue in order to provide

funds assertedly necessary for continued operation is a general rate case and not a complaint proceeding, even though the increase is not requested for all classes of customers. G.S. 62-72.

**2. Same—**

In a general rate case the function of the Utilities Commission is to determine whether a general increase or decrease in rates is warranted, and therefore in such proceeding the Commission has broad discretionary power to limit and exclude evidence relating to alleged discrimination between classes of customers, since the question of such discrimination properly pertains to a complaint proceeding which may be thereafter instituted by the class of customers asserting discrimination.

**3. Utilities Commission § 9—**

Where petitioner in a general rate case has introduced evidence showing its assets and liabilities, actual and adjusted income, average number of customers and quantity of gas used by each type of customer, the revenue provided by each type of user, etc., which evidence is plenary to support the crucial findings of fact, the denial of a protestant's request that the Commission reopen the case to require petitioner to furnish additional evidence relating to aspects which could not affect the result will not be held prejudicial, protestant having had the right to subpoena records and cross-examine during the hearing to develop such facts as it deemed necessary for the presentation of its case.

**4. Same—**

Where the order of the Utilities Commission granting petitioner an increase in rates in a general rate case is justified by the findings of fact which are supported by plenary evidence, the order of the Commission will be affirmed. G.S. 62-26.10.

APPEALS by Tidewater Natural Gas Company and City of Rocky Mount from *Copeland, S.J.,* February 4, 1963 Civil Term of WAKE.

North Carolina Natural Gas Corporation (hereafter Carolina) was incorporated in October 1955. It applied to and on 7 December 1955 received from the Utilities Commission (hereafter Commission) a certificate authorizing it to transport and distribute natural gas in the eastern part of the State. On 1 March 1957 the Federal Power Commission authorized Transcontinental Pipeline Corporation (hereafter Transco) to serve Carolina, allocating to it 39,780 MCF of natural gas per day. Carolina was unable to complete necessary financial arrangements until 15 October 1958; construction of its system of lines to transport and distribute gas was begun promptly and completed in September 1959. Carolina then began selling gas in accordance with rate schedules previously filed with and approved by the Commission.

It has 655 miles of transmission lines which enable it to sell gas to: the municipalities of Greenville, Monroe, Rocky Mount, and Wilson;

Tidewater Natural Gas Company (hereafter Tidewater), which distributes and sells gas in Fayetteville, Kinston, New Bern, Washington, and Wilmington; Riegel Paper Company in the operation of its business of producing pulp and paper; Carolina Power & Light Company, for use in its plants for generating electricity; U. S. Army at Fort Bragg; some farmers for use in curing tobacco; and brick kilns and ceramic plants. In addition to the 655 miles of transmission pipeline, it has some 283 miles of distribution lines distributing natural gas to citizens in the municipalities of Albemarle, Aberdeen, Benson, Clinton, Dunn, East Laurinburg, Farmville, Goldsboro, Hamlet, Laurinburg, Lillington, Lumberton, Norwood, Raeford, Red Springs, Rockingham, Roseboro, Salemburg, Southern Pines, St. Pauls, Tarboro, Wadesboro, and the unincorporated community of Erwin.

Carolina operates on a fiscal year basis beginning 1 October. It experienced a substantial loss during the first year of operation, i.e., the year which began 1 October 1959 and ended 30 September 1960. On 19 December 1960 it filed a petition with the Commission seeking an increase in rates to provide it with funds assertedly necessary for continued operation. Attached to its petition were schedules of proposed rates intended to produce the necessary funds. Tidewater, Riegel, Greenville, Rocky Mount, Wilson, the Secretary of the Army on behalf of the Executive Agencies of the United States, and certain brick plants intervened. They protested the proposed increases. The Commission suspended the proposed new rates but permitted Carolina to put these rates in effect under bond.

The increases proposed by Carolina related principally to the rates charged customers to whom it distributed gas, the municipalities purchasing for resale to citizens, and Tidewater purchasing for resale to citizens in the municipalities served by it. (The petition was amended at the hearing so as to eliminate increases affecting Riegel and the Army.)

The Commission held hearings in April and May 1961. It issued an order in September 1961 approving the proposed increases. The order contains a summary of the evidence, findings of fact, and conclusions. Tidewater and Rocky Mount excepted to the findings, conclusions, and order, and appealed to the Superior Court. The Superior Court, finding competent, material, and substantial evidence to support the Commission's findings which justified its order, approved the order of the Commission.

*J. Melville Broughton, Jr., and Robert B. Broughton, by J. M. Broughton, Jr., for appellant Tidewater Natural Gas Company.*

*Spruill, Trotter, Biggs & Lane, by James R. Trotter, for appellant City of Rocky Mount.*

*McCoy, Weaver, Wiggins & Cleveland, by Donald W. McCoy and John E. Raper, Jr., for appellee North Carolina Natural Gas Corporation.*

RODMAN, J.   While Carolina proposes to raise most of the money allegedly needed for the continuing and successful operation of its business from two classes, (a) its own customers to whom it distributes gas, and (b) municipalities and utilities who purchase for resale to their customers, this is nonetheless a general rate case and not a complaint proceeding provided for in G.S. 62-72. *Utilities Comm. v. Light Co.,* 250 N.C. 421, 109 S.E. 2d 253.

The Commission's findings, stated summarily in part and quoted in part, are: Carolina must pay for all the gas which it can demand and which Transco is obligated to furnish irrespective of whether Carolina uses the gas or not. This is denominated a demand charge. In addition to the demand charge it must pay a fixed rate per MCF for all gas actually used. This is denominated a commodity charge. "For the fiscal year 1959-60 the gross operating revenue of the company, adjusted, was $5,285,242. Total operating revenue deductions were $5,718,930, resulting in an operating loss of $433,688. Other income in the amount of $25,713 reduced the loss to $407,975. Income deductions in the way of interest on long-term debt, amortization of debt discount and expense and other items amounted to $1,080,566. Thus, the company experienced for the fiscal year a loss of $1,488,541.

"In an effort to reduce expenses the company has released a part of its allocated gas, thereby reducing its demand charge." (When the petition was heard, the demand had by contract been reduced from 39,780 to 20,000 MCF per day.) Transco has twice increased its rates since Carolina began operating. The latest increase became effective under bond on 17 April 1961. "Based on the proposed increased rates and the price of purchased gas under present rates the gross revenue of Carolina for the fiscal year 1960-61 will be $7,096,118. Operating revenue deductions will be $6,751,008, resulting in an operating income of $354,110. Income deductions for interest, amortization of debt discount and expense and other items will amount to $1,190,263 for a net loss of $835,990." (The figures for the year 1960-61 were based on actual experience for a three-month period and estimates for the remainder of the fiscal year. The estimate included an estimated increase in the number of customers and the amount of gas used per customer.) The estimated income for the fiscal year 1960-61 included

the sum of $218,000 estimated to be produced by the proposed rates. Carolina is going through the first stages of development and is experiencing large losses. "As of December 31, 1960, average utility plant in service, less average contributions in aid of construction and without any allowance for working capital, was $20,681,414." "Actually, it is not earning a rate of return at all but is operating at a deficit." Prior to the time Carolina began providing natural gas, its customers were using liquid petroleum. Appliances intended to use liquid petroleum had to be converted to use natural gas. Carolina was having to contribute substantially to these conversion costs. Transco's increase in rates, put in effect on 17 April 1961 under bond, would cost Carolina on its estimated use of gas for the fiscal year 1960-61 $269,000. Carolina's witness testified that he did not anticipate Federal Power Commission would approve Transco's proposed increase in full. (His estimate in that respect proved to be correct. Federal Power Commission actually allowed only a part of the increase sought by Transco. Nonetheless the part so allowed was substantial.)

The original schedule under which Tidewater purchased had an escalator clause providing for an increase or decrease in the rates charged it dependent upon increases or decreases in the cost of gas to Carolina. The new schedule applicable to Carolina omitted this clause. This omission and the asserted discrimination in the rate charged it as compared with rates charged other customers of Carolina form the basis of Tidewater's appeal.

Similar escalator clauses in other schedules were deleted from the new schedules. These clauses are advantageous to patrons when gas is in over supply and the producers reduce their price to dispose of their entire product; but the reverse is true when the product is scarce and the price goes up. Whether such a clause should or should not be incorporated in a particular rate schedule is more appropriate to a complaint case than to a general rate case.

In a complaint case the field of inquiry is limited to the comparatively narrow question of fair treatment to a group or to a class. Necessarily the Commission must be given broad discretion with respect to the extent which it will hear evidence relating to a particular schedule when the basic question for consideration is: Does the utility need an increase in rates to function effectively or, conversely, can the utility continue to operate, provide efficient service to its customers, and make a fair return to the owners of its properties, or may it so function after a reduction in rates? *Utilities Comm. v. Area Development, Inc.,* 257 N.C. 560, 126 S.E. 2d 325; *Utilities Comm. v. Light Co., supra.*

To require the Commission in a general rate case to go into minute details with respect to each of the proposed increases and the possible inequalities which might be created thereby would distract its attention from the crucial question, namely: What is a fair rate of return on company's investment so as to enable it by sound management to pay a fair profit to its stockholders and to maintain and expand its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise? *Utilities Comm. v. Gas Co.*, 254 N.C. 536, 119 S.E. 2d 469; *Utilities Comm. v. S.*, 239 N.C. 333, 80 S.E. 2d 133.

The other reason assigned by Tidewater for a reversal is an asserted discrimination in the rate which it pays under Schedule 2 and the rate charged under Schedule ME. Schedule 2 fixes the following rates:

Gas resold-interruptible 36¢ per MCF (an increase of 1.5%)

Gas resold-air conditioning 36¢ per MCF (a decrease of 25%)

All other gas 79.5¢ per MCF (an increase of 6.5%)

Schedule ME fixes the price of gas sold to the United States Government for military purposes and for military housing. It is not sold for resale. The rates charged under that schedule are:

Gas-interruptible 33.5¢ per MCF

Gas-air conditioning 50.73¢ per MCF

All other gas 70.73¢ per MCF

The company proposed no change in this schedule.

The rate charged for "all other gas" sold under Schedule ME is nearly 9¢ less than charged for "all other gas" sold under Schedule 2, but it will be observed that gas sold for air conditioning costs nearly 15¢ more when purchased under Schedule ME than when purchased under Schedule 2.

Several reasons might be suggested justifying these differences in rates. Whether the differences discriminate against Tidewater can be determined in a complaint hearing. The order which has been entered does not estop Tidewater from applying to the Commission for a modification, if in fact the order is discriminatory and to the detriment of Tidewater.

The questions presented by Rocky Mount's appeal, unlike the questions presented by Tidewater, are directed to the sufficiency of the evidence and findings to support a rate increase so as to provide a fair and reasonable return for the services furnished. It says in its brief: "The City acknowledges that the evidence shows that North Carolina

Natural has and is likely to continue to experience losses. However, its position is that this does not authorize the Commission to disregard the rate-making procedures required by law. Whether it does is the underlying question presented by this appeal."

Rocky Mount, after the hearing had concluded, asked the Commission to reopen the case and require Carolina to furnish evidence of (1) the original cost of Carolina's property, (2) replacement cost, (3) "trended cost" of the property, (4) income statement for the period beginning 1 January 1960 and ending 31 December 1960, (5) details with respect to the manner of computing depreciation, (6) a detailed showing with respect to the portion of the rate base allocated to the transmission system and the portion allocated to the distribution system of the business, and (7) similar breakdowns with respect to Carolina's income.

The request was denied. The parties, of course, had a right on cross-examination during the hearing to develop such facts as they deemed necessary for presentation of their case. They had a right to subpoena the company's records, but when the hearings had concluded and the parties had been given full opportunity to present their cases, it was a question for the Commission whether it had sufficient evidence to determine the issues raised by the petition and answers. It had the discretionary power to take additional evidence, but was not required to do so. *Miller v. Greenwood*, 218 N.C. 146, 10 S.E. 2d 708. Certainly there is nothing in this record to indicate the Commission acted capriciously.

Petitioner's exhibits included statements showing (1) its assets and liabilities, (2) actual and adjusted income for the fiscal year beginning 1 October 1959 and ending 30 September 1960, (3) average number of customers billed for gas used for differing purposes such as residential, commercial, industrial, interruptible, military, etc., (4) the quantity of gas used by each type of customer, (5) the amount of revenue provided by each type of user under the old and proposed rates, (6) the amount of gas used by Rocky Mount and the other municipalities purchasing for resale with a statement of the cost under the old and proposed rates, (7) a statement of the amount paid Transco for gas purchased under its old rate for the months of October, November, and December 1959 and January, February, and March 1960, with an estimate of the amounts to be paid for the remainder of the year under the higher rate charged by Transco, (8) estimates of gas to be sold each month during the year to begin 1 October 1960 and end 30 September 1961, and the income which would be received under the old and new rates, (9) the amount actually in-

vested in plant and working capital providing a rate base on 31 December 1960 in excess of $20,000,000, (10) estimated cash flow for the period 1 February through 30 September 1961, (11) the capital structure consisting of capital stock, mortgages, and income debentures.

The several schedules were explained in detail by witnesses for petitioner. On 31 December 1960 its mortgage and debentures represented 91.16% of its capital structure. When the application for an increase in rates was filed, the plant was a new one. It was not completed and put in operation until September 1959. Appellants offered no evidence indicating the work of construction was not carried out in an economical manner. There is nothing to suggest that replacement cost or "trended cost" differs materially from the cost of construction. In this situation it would seem unreasonable and unjust to Carolina to require it to make substantial expenditures for cost studies which could in no way affect the result.

Carolina did not base its application on a desire to provide a fair and reasonable return to its stockholders. It merely asked for funds sufficient to permit it to live until it has developed its business to a point where it can hope to make some, if not a fair, return to its owners. If and when that date arrives, appellant may file its petition with the Commission for a re-examination of the capital structure and what the company should be permitted to earn for the services which it renders.

We find nothing in the evidence indicating rate discriminations requiring Rocky Mount to charge its customers a higher rate than Carolina charges its customers for similar service. If Rocky Mount feels that the rate charged it necessarily results in a discrimination between those who buy from it for use and those similarly situated in other municipalities of the State who purchase from Carolina, Rocky Mount may, by complaint, request the Commission to correct that inequality.

Our examination of the record leads to the conclusion that the Commission had plenary evidence to support its findings, hence binding on appeal, G.S. 62-26.10, and these findings justify its order. It follows that the judgment of the Superior Court must be and is

Affirmed.