STATE OF NORTH CAROLINA EX REL NORTH CAROLINA UTILITIES COMMISSION, AMERICAN TOBACCO COMPANY, WM. MUIRHEAD CONSTRUCTION COMPANY, INC., CITY OF WILMINGTON, NORTH CAROLINA DEPARTMENT OF AGRICULTURE, F. S. ROYSTER GUANO COMPANY, SMITH-DOUGLASS COMPANY, INC., ROBERTSON CHEMICAL CORPORATION, VIRGINIA-CAROLINA CHEMICAL CORPORATION, WILMINGTON FERTILIZER-COMPANY, HEIDE WAREHOUSE COMPANY, CAROLINA NITROGEN COMPANY v. THE SOUTHERN RAILWAY COMPANY, ATLANTIC & EAST CAROLINA RAILWAY COMPANY, CAROLINA & NORTHWESTERN RAILWAY COMPANY, PIEDMONT & NORTHERN RAILWAY COMPANY, CAMP LEJEUNE RAILROAD COMPANY, STATE UNIVERSITY RAILROAD COMPANY, LOUISVILLE & NASHVILLE RAILROAD COMPANY, NORFOLK & WESTERN RAILWAY COMPANY, NORFOLK SOUTHERN RAILWAY COMPANY, SEABOARD AIR LINE RAILROAD COMPANY, ATLANTIC COAST LINE RAILROAD COMPANY, ALEXANDER RAILROAD COMPANY AND THE CLINCHFIELD RAILROAD COMPANY.

(Filed 25 May, 1966.)

1. **Utilities Commission § 6—**

The burden is upon the carriers asking for increase in rates to prove justification for the increase and that the proposed rate is just and reasonable. G.S. 62-75.

2. **Utilities Commission § 9—**

An order of the Utilities Commission is *prima facie* correct.

3. **Utilities Commission § 1—**

The General Assembly has delegated to the Utilities Commission its authority to fix or approve rates of public service corporations, and the fixing of such rates is a function of the Utilities Commission and not the courts.

4. **Utilities Commission § 9—**

The courts may review an order of the Utilities Commission only to the extent of determining whether the Commission acted reasonably and legally within the exercise of its delegated authority, whether the Commission's findings are supported by evidence, whether the proceedings before the Commission met the requirements of due process, and whether the Commission has acted arbitrarily, unreasonably, or its order was confiscatory.

5. **Same—**

The findings of the Utilities Commission are conclusive when supported by competent evidence, notwithstanding the evidence might support a contrary finding.

6. **Utilities Commission § 6— Order denying increase in rates will not be disturbed when petitioning carriers fail to show proposed increase was just and reasonable.**

Petitioning carriers requested uniform increase in their charges for designated types of switching services at all points in the State. The

existing rates were not uniform at all switching points, and the carrier's evidence disclosed that their cost analysis of such operations was based on averages for the country as a whole without regard to the varying factors at each switching point, and the carrier's expert testified that it would be impossible to determine what part of the costs were attributable to the various switching points in North Carolina. *Held:* The carriers failed to prove that the proposed increase was just and reasonable, and order of the Utilities Commission denying the increase will not be disturbed.

MOORE, J., not sitting.

LAKE, J., did not participate in the consideration nor the decision of this case.

BEFORE *Riddle, S.J.,* (without jury) November 29, 1965 Civil Term, WAKE Superior Court. Defendants appealed.

On June 2, 1964, the twenty-nine railroads doing business ·in North Carolina filed a proposed tariff to increase charges for certain designated types of switching services at all points in the State. Under the authority of G.S. 62-134, the North Carolina Utilities Commission on July 20, 1964 suspended the proposed increase and set the matter for investigation and hearing. The railroads proposed increases as follows:

(1)   $7.50 per car for intra-terminal movements of freight cars from one point in the terminal to another.

(2)   $7.50 per car on inter-terminal switching, which involves movement from one terminal in a city to another in the same city.

(3)   $7.50 per car on non-absorbed reciprocal switches for cars where an industry is located on a railroad which does not participate in line-haul movements and does not share in the revenue from the line-haul movement. A line-haul movement is one where the shipment moves from one city to another over the tracks of one or more carriers.

(4)   $3.00 per car on intra-plant switching, which is the switching of a car from one point within the confines of an industry to another point within the confines of the same industry where the car does not leave the property of the industry.

Upon the filing of the proposed increases, protests and interventions were filed as follows:

(1)   The City of Wilmington objected to the increase on intra-terminal and inter-terminal switching of fertilizer at Wilmington.

(2)   The American Tobacco Company objected to the increase on intra-terminal and inter-terminal switching of tobacco and tobacco products at Durham and Reidsville.

(3)   The following group of companies objected to the increase on switching charges as it related to switching of fertilizer at Wilmington: F. S. Royster Guano Company, Smith-Douglass Company, Robertson Chemical Corporation, Virginia-Carolina Chemical Corporation, Wilmington Fertilizer Company, and Heide Warehouse Company.

(4)   The North Carolina Department of Agriculture objected to the increase on switching charges for fertilizer and fertilizer materials.

(5)   The Wm. Muirhead Construction Company, Inc., objected to the increase on switching charges for crushed stone and aggregates in Durham, North Carolina.

The matter came up for hearing before the Utilities Commission in February, 1965 with the result that the Commission, by order dated August 31, 1965, held that the proposed increases in switching charges were unjust, unreasonable and discriminatory, and ordered the tariff withdrawn and cancelled.

The principal witnesses for the railroads were Mr. Neil S. Simpson, Senior Cost Analyst of Southern Railway and Mr. W. A. Robertson, General Statistician for Seaboard Railroad. They supervised tests, compiled the results and testified at length in behalf of their employers. Their evidence, with some additions from other witnesses, showed the results of costs studied in six cities. They said Durham, Wilson and Reidsville were selected because protests had been filed from shippers in those cities. Charlotte was selected because it is the largest city in North Carolina and has extensive switching operations. Plymouth was selected to represent a small community with relatively little switching operations. Wilson was selected as a medium-sized community. The result of the studies made in these cities, shown on Exhibit 17, and the railroads' evidence tended to show the cost and revenue for twenty-three separate switching operations in the six North Carolina cities, and costs exceeded revenue under present charges in all of them. It showed also that of the twenty-three switching operations in intra-terminal switching, only Reidsville's revenue exceeded cost under the proposed increased charges. It further showed that the increase would result in approximately $178,910 annually to all of the railroads doing business in the State. The Roads contended that switching costs are divided into two separate and distinct categories. One is the cost associated with operation of the switch engine — the wages

of the crew, the fuel, maintenance and repairs of the engine, and similar expenses. The other is the cost associated with the ownership of the car involved in the switching operation, such as depreciation, maintenance and repairs of that car.

The Roads claim that the method used by them was in accordance with procedures approved by the Interstate Commerce Commission.

Using riders on switch engines of the four major railroads of the state, to wit; Southern Railroad, The Atlantic Coast Line, the Seaboard Airline Railway and Norfolk Southern, detailed studies were conducted. Upon the basis of these studies the statisticians for the railroads compiled and offered in evidence an exhibit purporting to show the number of "switch engine minutes" consumed in switching one car in each type of switching movement at each city so studied. The railroads then presented the witness Simpson's computation of the cost of service per "switch engine minute" used per car in each type of switching movement at each city studied. The result so obtained was asserted by him to be the cost to the railroad of moving one car in that type of switching movement at that city. On the basis of this computation, Mr. Simpson testified that the cost of operating a switch engine for one minute was 96.267 cents or $57.76 per hour. In arriving at these figures the railroads combined the system-wide operating costs of the Southern, Seaboard, Coast Line and Norfolk-Southern and then allocated the combined costs to the switch engine operations, resulting in their computation of a uniform cost of a "switch engine minute" at all terminals and in all switching services. They also used some statistics applicable to railroads generally throughout the United States but claim that since the fuel, wages and the number of operators are the same everywhere, there will be no material difference in the cost of operating a switch engine in North Carolina and in other states.

Upon the basis of the computations so made by him, Mr. Simpson testified that the average cost per car switched in all states in which these railroads do business exceeds the average revenue per car, which would be derived from the switching, assuming the increase sought in this case to be in effect; that for the latest period of time covered by their tests, October, 1964, the cost of switching a car in intra-terminal service is approximately double the revenue received; that the cost of switching a car in the inter-terminal service is more than double the revenue. They say in their brief that the cost of operating a switch engine for one minute is the same or substantially the same in North Carolina as it is elsewhere; that even with the proposed increases the railroads would conduct their

switch operations at a loss at all the points tested, except in Reidsville; that they are all operating at a loss without the increase.

The case on appeal consists of two volumes of almost six hundred pages and it is manifestly impossible to refer to all of the details of the evidence. However, the preceding constitutes a fair analysis and summary of the evidence tending to support the position of the railroads.

The protestants offered evidence in opposition of that of the railroads and upon cross-examination of the witnesses for the latter, made a number of contentions, some of which are herein set out. They attacked the validity of the methods used and the results so computed by this study, both as to the number of "switch engine minutes" used in each such service and as to the cost per "switch engine minute."

Based largely upon evidence elicited from the carriers' witnesses they say that Mr. Simpson's cost figures are not supported by facts but are founded in substantial part upon arbitrary charges based upon agreements for car rentals among the railroads; that many of the costs claimed are for depreciation, repairs and maintenance of the cars used but that the railroads offer no figures to substantiate such costs; that they use $10.97 for car ownership cost by the Coast Line at Wilmington, the total cost being $33.32. The figures for Seaboard at Wilmington are $11.33 for car ownership cost while the total is $31.25. They point out that the car ownership costs approximate one-third of the total cost for switching operations but call attention to the evidence showing that a large number of the Seaboard cars are owned by it and have been fully depreciated and written off; that they are not usable otherwise and are never cleaned or washed. They further contend that the evidence shows that one car out of seven received by Smith-Douglass and Royster in Wilmington was a private tank car for which car ownership was not properly chargeable. They further contend that if the percentage of privately owned cars was any less at other plants, the railroads would have presented evidence accordingly.

The protestants called attention to the fact that the railroad's evidence of costs was based upon only six switching yards; whereas, there are fifty-one in the state; that only four of the twenty-nine railroads in the state were involved in the test and that the rates now charged are not uniform, neither are the costs. They called attention to the difference in intra-terminal switching rates as follows: Wilmington $20.14, Greensboro $7.12, Winston-Salem $11.88, Concord $11.98, Asheville $14.62, Charlotte $15.35. They then compared these rates with the cost claimed by the railroads: Plymouth $32.95, Durham $43.24 and Wilmington $33.32; calling attention to the fact

that the cost in Charlotte is higher than in Wilmington but that the rate in Wilmington is higher than the one in Charlotte. The defendants also elicited evidence tending to show that practically all of the figures offered by the railroads deal with average costs of the four different railroads in the six cities tested; that nowhere do they purport to be accurate with respect to any particular railroad at any particular place, primarily because a substantial part of the charges alleged are based upon agreements among the railroads and are not applicable to this case. They further challenge the allocation to yard switching on a system-wide basis which included charges for maintenance of wharves, docks, drawbridge operation, and other operations which would apply to only some of. the railroads but not to any substantial number of the twenty-nine railroads in the State, nor to all the fifty-one switching yards. They further contend that the evidence of Mr. Simpson was originally to the effect that it would be impossible to develop the intra-state engine hours in any state; that he did not know how much is attributable to North Carolina Inter and Intra-state; that the carriers later claim they could make such showings now; from which the protestants make the argument that the evidence as offered by the railroads is not reliable and should not be used by the Commission. Other features of the evidence will be considered in the opinion.

From the refusal of the Commission to approve the proposed increased charges, the railroads appealed to the Superior Court which upheld the ruling of the Commission and the defendants appealed to the Supreme Court.

*Joyner & Howison by W. T. Joyner, Jr.; Maupin, Taylor & Ellis by Frank W. Bullock, Jr.; Simms & Simms by R. N. Simms, Jr., for defendant appellants; of Counsel: Mr. Henry J. Karison, Southern Railway System; Mr. Charles B. Evans, Atlantic Coast Line Railroad Co.; Mr. James L. Howe, III, Seaboard Air Line Railroad Co.*

*Thomas Wade Bruton, Attorney General, George A. Goodwin, Assistant Attorney General, for North Carolina Department of Agriculture, appellee; Edward B. Hipp, Attorney for North Carolina Utilities Commission; Cicero P. Yow, Attorney for City of Wilmington, by Edward B. Hipp, plaintiff appellees.*

*Bryant, Lipton, Bryant & Battle by Victor S. Bryant, Attorneys for Protestant, The American Tobacco Company.*

*Boyce, Lake & Burns by F. Kent Burns, Attorneys for F. S. Royster Guano Company, Smith-Douglass Company, Inc., W. R. Grace & Co., V-C Chemical Company, Carolina Nitrogen Company, and Heide Warehouse Company — appellees.*

*Albert W. Kennon, Attorney for Protestant Appellee, Wm. Muirhead Construction Company, Inc.*

PLESS, J. In determining this appeal the railroads are confronted with the statutes and decisions of the Court, which provide that the burden of proving the justification for increased rates is on them. They are required, too, to show that the proposed rate is just and reasonable. "G.S. 62-75. BURDEN OF PROOF. —In all proceedings instituted by the Commission for the purpose of investigating any rate, service, classification, rule, regulation or practice, the burden of proof shall be upon the public utility whose rate, service, classification, rule, regulation or practice is under investigation to show that the same is just and reasonable. In all other proceedings the burden of proof shall be upon the complainant." They must also overcome the presumption that the order of the Commission is *prima facie* correct, G.S. 62-94(e) provides the scope of review on appeal, in part, as follows:

"Upon any appeal, the rates fixed, or any rule, regulation, finding, determination, or order made by the Commission under the provisions of this chapter SHALL BE PRIMA FACIE JUST AND REASONABLE . . ."

Stated another way, the shippers and customers of the railroads have no burden of proving anything; the previous rates are presumed to be fair and reasonable — so are the orders of the Commission.

This Court is not expected to determine freight rates, that is the function of the Commission. The right to fix or approve the rates to be charged by public service corporations for the services rendered the public rests in the Legislature. The General Assembly may act directly or delegate its authority to a Legislative Agency or Commission for that purpose. " 'It is the prerogative of that agency to decide that question. It is an agency composed of men of special knowledge, observation, and experience in their field, and it has at hand a staff trained for this type of work. And the law imposes on it, not us, the duty to fix rates.' " *Utilities Com. v. State* and *Utilities Com. v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133.

In 73 C.J.S., Public Utilities, § 32, p. 1056 it is said that: A Utilities Commission "is an expert, technical body which devotes its time and talents to the administration of some of our largest and most complex businesses."

"That a specially trained body of experts in charge of public utility matters is necessary and should be expected and permitted to dispose of such questions in the exercise of their best judgment

unless their action is arbitrary or unreasonable is the basis of the principle of commission control as expressed in the case of *State Public Utilities Commission v. Springfield Gas & Electric Co.,* 291 Ill. 209, 125 N.E. 891, P. U. R. 1920C, 640: 'The law is settled in this state that the matter of rate regulation is essentially one of legislative control. The fixing of rates is not a judicial function, and the right to review the conclusion of the Legislature or administrative body, acting under authority delegated by the Legislature, is limited to determining whether or not the Legislature or the administrative body acted within the scope of its authority, or the order is without substantial foundation in the evidence, or a constitutional right of the utility has been infringed upon by fixing rates which are confiscatory or insufficient to pay the cost of operating expenses and give the utility a reasonable return on the present value of its property. *Chicago, Milwaukee & St. Paul Railway Co. v. Public Utilities Com.,* 268 Ill. 49, 108 N.E. 729, [P. U. R. 1915D, 133]; *Public Utilities Com. v. Chicago & West Towns Railway Co.,* 275 Ill. 555, 114 N.E. 325, Ann. Cas. 1917C, 50, [P. U. R. 1917B, 1046]. The Public Utilities Act gives the courts power to determine whether or not evidence has been properly received or rejected, and whether there is sufficient evidence in the record to support the finding of the commission. If the order does not contravene any constitutional limitation and is within the constitutional and statutory authority of the commission and has a substantial basis in the evidence, it cannot be set aside by the courts. The court is without authority to set aside such an order unless it is against the manifest weight of the evidence. * * * It is clear from the salary fixed for the commissioners and the great power vested in the commission by the Public Utilities Act that the Legislature intended to create an office of dignity and great responsibility. It is, therefore, not to be expected that through fear of popular disfavor the commission will coyly toy with the situation. It sits to administer justice to individual and corporation, the weak, the strong, the poor, the wealthy, indifferently, fearing none and fawning on none. The notion that commissions of this kind should be closely restricted by the courts, and that justice in our day can only be had in courts, is not conducive to the best results. There is no reason why the members of the Public Utilities Commission of this state should not develop and establish a system of rules and precedents as wise and beneficial, within their sphere of action, as those established by the early common-law judges. All doubts as to the propriety of means or methods used in the exercise of a power clearly conferred should be resolved in favor of the action of the commissioners in the interest of the administration of the law. There should be ascribed to

them the strength due to the judgment of a tribunal appointed by law and informed by experience. * * * The necessity of public regulation of rates arises out of the monopoly of the public service company. The unregulated price of the service ceases, except so far as some substitute for the particular service may be found, to be determined by competition, and the individual consumer is unable to contract on equal terms. Fixing rates by public authority may secure to each individual the advantage of collective bargaining by or in behalf of the whole body of consumers, and result in such rate as might properly be supposed to result from free competition if free competition were possible. A just and reasonable rate, therefore, is necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold.'" Pond, Public Utilities, 3rd Ed., § 904, p. 936.

On review, this Court is limited in scope to the questions involved. As stated in 73 C.J.S., Public Utilities, § 64, j.(1), p. 1157:

> "The powers to be exercised by a court on appeal from an order of a public utility or similar commission are restricted to those conferred by constitution or statute. The reasonableness and lawfulness of an order are subject to review on appeal; and the order may be set aside if it is unlawful or unreasonable or both unlawful and unreasonable.
>
> "* * * (T)he only issue before the reviewing court is whether the commission has acted reasonably and legally or has exceeded or abused its powers, and the review is limited to the questions whether the commission acted within the scope of its authority, whether the order is supported by evidence, and whether any constitutional right of a party is infringed thereby, these questions being included in the issue of the reasonableness and lawfulness of the order."

. As stated in Pond, Public Utilities, vol. 2, 4th Ed., Sec. 548, p. 984:

> "The court * * * is restricted to the question of determining whether any particular rate already fixed is reasonable or otherwise and can not itself fix such rate because this power inheres entirely in the legislative department of the state."

In *re* the legislative character of fixing rates, the following from 73 C.J.S., Sec. 41, a, p. 1081, is applicable:

> "Although, in establishing rates for public utilities, a public utility commission does not exercise the full power of the legislature in that regard, the action of a public utility commission

in regulating rates is legislative in character, and is subject to the same tests and commands the same regard as a legislative enactment."

With respect to the presumption of validity of rates established by the Utilities Commission, the general rule is stated in 43 Am. Jur. Sec. 186, p. 695:

"In general, a rate fixed by an authorized rate-making body for a public utility is presumed to be valid and reasonable. Accordingly, the courts will not enjoin or interfere with the collection of rates established under legislative sanction unless they are plainly and palpably unreasonable, confiscatory, or excessive, and clearly proved to be such, or unless there was fraud or arbitrariness in fixing such rates."

In effect, this Court occupies the same relative position to the Utilities Commission that it does to the Workmen's Compensation Commission. That is, if the order of the Commission is supported by any reasonable construction of the evidence it is not to be disturbed because a different interpretation could have been placed upon it. We feel that upon a consideration of the evidence before it, the Commission was well justified in failing to find that the proposed increased rates were fair and reasonable.

It has been accepted by all parties that this is not a general rate case. The parties apparently agree that it is one in which the railroads seek a uniform increase on switching charges. While the increase sought appears to be uniform with all of the railroads at all switching points, there the uniformity ceases. Neither the switching charges nor the costs are uniform throughout the State and, as stated previously, the rates extend from $11.98 to $20.14 while the costs claimed by the railroads fluctuate from $32.95 to $43.24, so that only an average cost or an average rate can be presented. The evidence of the railroads shows that an identical increase at every switching point has to be arbitrary and discriminatory. It would put into effect increases in charges for a number of unrelated services at unrelated localities by unrelated railroads. We cannot accept evidence of costs in a seaport town such as Wilmington with its docks, wharves and drawbridges as valid in a hilly or mountain section, such as Asheville or even Winston-Salem. The six appellees, whose operations are in Wilmington, have no interest or concern with costs or rates in Charlotte or Durham.

The carriers contend that they can fairly use National figures as to operations, wages, fuel, maintenance, repairs, depreciation and other business expenses which are the same everywhere. If that be

true, we can see no reason why they can make a profit with the proposed increases at Reidsville but will continue to lose varying and wide-spread amounts at other terminals. While they seek a flat rate increase for switching services at all cities, Mr. Simpson testified that due to the more expensive equipment in use in Charlotte, the switching is more expensive there than at Wilmington.

The Commission was well justified in failing to accept the contentions of the railroads. At one point in their evidence their witness said, "It would be impossible to develop the intrastate engine hours in any state. I do not know how much is attributable to North Carolina all total, interstate and intrastate. I do not know how much is attributable to switch operation in North Carolina. * * * It is a physical impossible *(sic)* element to develop the separate costs of North Carolina." However, in their briefs, the railroads say that after the Commission's order, they made a study to determine if it were possible to allocate switching costs to North Carolina by reasonably sound and acceptable methods and had determined that this was possible. In view of this statement, it is apparent that the evidence in the record could not be entirely accurate. Taking this situation into consideration and in view of the disparity in costs, as well as revenue, in the six cities tested, we can see no more reason for a uniform increase throughout the State than for the substantial difference in the present charges. The railroads chose the yards to be tested and presumably picked the six they expected to support most favorably their claims. Even from this "chosen few" one will show a profit. We can only surmise that tests at the forty-five other yards would have yielded less favorable results.

The railroads are at liberty to make further application for increased charges which do not have to be uniform but could very properly be based upon actual costs and charges under the prevailing conditions.

The Court has considered all of the exceptions brought forth by the fourteen railroads appealing the order of the Utilities Commission and the judgment signed by Judge Riddle. We are of the opinion that they should not be sustained.

Affirmed.

Moore, J., not sitting.

Lake, J., did not participate in the consideration nor the decision of this case.