STATE OF NORTH CAROLINA, EX REL UTILITIES COMMISSION, AND
SOUTHERN RAILWAY SYSTEMS AND NORTH CAROLINA RAIL-
ROADS, SOUTHERN TERRITORY RAIL CARRIERS (GENERALLY)
AND SEABOARD COAST LINE RAILROAD (SPECIFICALLY), RESPON-
DENT RAILROADS, APPELLEES v. BOREN CLAY PRODUCTS COM-
PANY, PROTESTANT-INTERVENOR, APPELLANT

No. 7810UC1029

(Filed 19 August 1980)

1. Carriers § 5.2– rail rates for crude earth – complaint proceeding – certain classes of evidence not required

In a complaint proceeding to determine the reasonableness of proposed increased intrastate rates for the shipment of crude earth by rail, respondent railroads were not required to furnish the classes of evidence required by N.C.U.C. Rule R1–17(b), subsections (1)–(11), since those subsections were intended to apply only to general rate cases involving utilities other than railroads.

2. Carriers § 5.2– rail rates for crude earth – complaint proceeding – use of regional cost data

In a complaint proceeding to determine the reasonableness of proposed increased intrastate rates for the shipment of crude earth by rail, respondent railroads were not required to produce evidence of North Carolina expenses and revenues separated from regional data where the record as a whole contained substantial, competent and material evidence to support a finding by the Utilities Commission that the Southern Region cost data furnished by the railroads was representative of North Carolina costs.

3. Carriers § 5.2– rail rates for crude earth – complaint proceeding – costs of shipments by protestant

In a complaint proceeding to determine the reasonableness of proposed increased intrastate rates for the shipment of crude earth by rail, respondent railroads were not required to present evidence of actual costs of shipments by protestant brick company between its mine and its manufacturing plant since the appropriate group or class for the Utilities Commission's consideration was not protestant as an individual shipper at a certain mileage level but all present and future shippers of crude earth who would be affected by the scale of rates.

4. Carriers § 5.2– increased rail rates for crude earth – complaint proceeding – emergency or change of circumstances not required

In a complaint proceeding to determine the reasonableness of proposed increased intrastate rates for the shipment of crude earth by rail, the Utilities Commission was not required to make a specific finding that an emergency or change of circumstances not affecting the entire rate structure has occurred in order to allow a change in the rates. In any event, evidence showing that the existing scale of rates has become unremunera-

tive at various mileage levels such that respondents are unable to recover the fully allocated cost of providing rail service to shippers of crude earth is clearly sufficient to show a "change of circumstances" not affecting the entire rate structure.

5. **Carriers § 5.2– rail rates for crude earth – short line mileage – rates not formulated to cover costs for actual distance**

There is no merit to protestant's contention that an approved joint line rate for the movement of crude earth by rail was formulated by respondent railroads to cover their costs for the actual 151-mile distance of the movement of protestant's crude earth rather than for the shorter available rail distance of 98 miles in indirect violation of G.S. 62-145 where the protestant was charged only the lawful 100-mile rate, and the rate for the short line mileage was set on the basis of representative systemwide average unit cost data.

6. **Carriers § 5.2– rail rates for crude earth – differential between joint and single line rates**

The differential between joint and single line rates for the intrastate shipment of crude earth by rail is not unjustifiably burdensome and discriminatory, although the Utilities Commission approved tariff changes which increased single line rates 7.17% and joint line rates 18.73%, where respondent railroads presented evidence that joint line costs for a given movement will be higher than single line costs because of the necessity of interchange of equipment and additional billing, and where the evidence showed inability of the railroads to recover fully their costs even at the approved new rates.

7. **Carriers § 5.2– differential between rates for crude earth and rates for sand and gravel**

The Utilities Commission properly concluded that the differential between approved rates for the movement of crude earth by rail and existing rates for sand and gravel was not discriminatory where such conclusion was based on a finding that the rate for the movement of crude earth from protestant's mine to its manufacturing plant was $0.01 less than like shipments of sand and gravel, and this finding was based on a comparison of the approved rates for crude earth and the rate for sand and gravel which was first disapproved and later approved by the Commission.

APPEAL by protestant-intervenor from Utilities Commission, Docket No. R-66, Sub 82. Order entered 2 August 1978. Heard in the Court of Appeals 22 August 1979.

This case arose out of a protest and petition for suspension filed 29 June 1976 by Boren Clay Products seeking cancellation or withdrawal of tariff schedules filed by the Southern Freight Tariff Bureau (Southern Freight Association, agent) on behalf of Southern Railway Systems and North Carolina Railroads,

Southern Territory Rail Carriers and Seaboard Coast Line Railroad, which proposed increased intrastate rates in North Carolina for the movement of brick or tile raw materials (known as "crude earth"). The tariff schedule consists of two scales of rates, one scale applicable to "joint line" hauls, that is, those involving two rail carriers, and one scale applicable to "single line hauls," those involving one rail carrier. Within each scale the rates vary according to the mileage involved in the haul.

Protestant Boren Clay Products is a manufacturer of brick which regularly ships crude earth by rail from a mine at Boren Siding, North Carolina, to its manufacturing plant at Roseboro, North Carolina. Protestant's crude earth material is transported eleven miles from Boren Siding by Southern Railway Company and is then interchanged and transported to Roseboro by Seaboard Coast Line for a distance of approximately 140 miles. Although the actual rail distance of the movement totals 151 miles, there is a shorter available rail distance of 98 miles. Pursuant to G.S. 62-145, protestant was charged the joint line rate prior to the increase of $2.83 per net ton of crude earth based on that shorter distance. As a result of the proposed increase, the applicable joint line rate for the same haul was set at $3.36 per net ton.

By order of the Commission dated 7 July 1976, the proposed rates were suspended pending hearing. Following an evidentiary hearing, the hearing officer entered a recommended order on 4 April 1977 granting the rate increase. In that order he found that the existing single line and joint line scales of rates failed to cover fully allocated costs in all mileage blocks from 25 to 600 miles, and that in the instances where variable costs did not exceed the existing rates, contribution was minimal. He further found that the variable and fully allocated costs of Boren's actual movement of crude earth exceeded the existing rates. Concluding that the proposed tariff schedules for crude earth were just and reasonable and that the respondents were in need of such increases, the hearing examiner ordered that the order of suspension be vacated and the tariff schedules allowed to become effective. Protestant duly filed exceptions to the recommended order pursuant to G.S. 62-78. Following oral argument on those exceptions, the full Utilities Commission

entered a further order on 2 August 1978 affirming the recommended order of 4 April 1977. From that order protestant appealed.

*Stern, Rendleman, Isaacson & Klepfer by Robert O. Klepfer, Jr. and Richard L. Gray for protestant-intervenor appellants.*

*Joyner & Howison by Edward S. Finley, Jr. for respondent railroads appellees.*

PARKER, Judge.

Under G.S. 62-75 the burden of proof at the hearing before the Commission rested upon the respondent railroads to show that the proposed rates were just and reasonable. *Utilities Commission v. R.R.*, 267 N.C. 317, 148 S.E. 2d 210 (1966). The Utilities Commission found that respondents had met that burden. Upon this appeal the order of the Commission allowing the rate increase shall be deemed "prima facie just and reasonable," and protestant bears the burden of showing some error of law. G.S. 62-94. *See Utilities Com. v. R.R.*, 235 N.C. 273, 69 S.E. 2d 502 (1952).

Protestant Boren contends that in order to satisfy their burden of proving that the proposed rates for crude earth were just and reasonable, the respondents were required to, but did not: (1) supply the classes of evidence required by N.C.U.C. Rule R-17(1)-(11); (2) produce evidence of North Carolina expenses and revenues separated from systemwide costs; (3) show actual cost of affected movements; and (4) show an emergency or change of circumstances justifying the proposed increases. We conclude that respondents were not required to do so.

G.S. 62-137 provides that, in setting a hearing, the Utilities Commission "shall declare the scope of the hearing by determining whether it is to be a general rate case, under G.S. 62-133, or whether it is to be a case confined to the reasonableness of a specific single rate, [or] a small part of the rate structure . . . ." In the present case the hearing officer expressly found in the recommended order which was affirmed by the Commission that the proceeding involved only "a small segment of the re-

spondents' rate structure." Thus, "the field of inquiry [was] limited to the comparatively narrow question of fair treatment to a group or to a class." *Utilities Commission v. Gas Co.*, 259 N.C. 558, 562, 131 S.E. 2d 303, 306 (1963).

[1] In view of the nature of the proceeding, we reject protestant's contention that respondents were required to furnish the classes of evidence required by N.C.U.C. Rule R1-17(b), subsections (1)-(11). Among the materials required by that rule are: evidence of the original cost of property, the present fair value of the utility's property, balance sheets, and the amount of cash working capital. Rule R1-17 in general substantially tracks the provisions of G.S. 62-133 and was clearly intended by the Utilities Commission to supplement that statute. Because the narrow scope of a complaint proceeding "does not justify the expense and loss of time involved," *Utilities Comm. v. Light Co.*, 250 N.C. 421, 431, 109 S.E. 2d 253, 261 (1959), it is well established that G.S. 62-133 is inapplicable to a case such as is here presented. Protestant reasons, however, that because N.C.U.C. Rule R1-17(b)(12) specifies the materials required to be furnished by Class I railroads in applying for general rate increases and states that such materials are in lieu of those required by N.C.U.C. Rule R-17(b)(1)-(11), subsections (1) through (11) must be applicable to railroads which seek a change in a small part of their rate structure. We disagree. A logical reading of N.C.U.C. Rule R1-17 leads to the conclusion that while subsection (12) applies to applications by railroads for general rate increases, subsections (1) through (11) were intended to apply to general rate cases involving utilities *other than railroads*.

[2] Protestant's challenge to respondents' failure to separate intrastate revenues and expenses from systemwide data is based upon its assignment of error to the Commission's finding that regional cost data was relevant and appropriate for use in costing the intrastate movement of crude earth in North Carolina. At the hearing respondents' principal evidence in support of their proposed rate increases for crude earth consisted of unit cost data for railroad traffic in the "Southern Region," including nine southern states plus half of Louisiana. It is true that, in a general rate case, separation of intrastate revenues and

expenses from systemwide data may be necessary, since operations of a regulated industry in two or more states are separate businesses for the purpose of rate regulation. *Utilities Commission v. Telephone Co.*, 263 N.C. 702, 140 S.E. 2d 319 (1965). In support of its contention that separation of intrastate expenses from systemwide data is necessary even in a case where, as here, only a portion of the rate structure is involved, protestant relies upon the decision of our Supreme Court in *Utilities Commission v. R.R.*, 267 N.C. 317, 148 S.E. 2d 210 (1966). In that case a group of railroads proposed a uniform increase in charges for switching services at all points in the State. At the hearing before the Commission following suspension of the proposed increases, the railroads offered evidence of costs based upon only six of the fifty-one switching yards in the State to which the proposed rates would apply. The Court held that the Utilities Commission properly denied the proposed increases on the ground that the cost figures did not justify a uniform increase, stating: "We cannot accept evidence of costs in a seaport town such as Wilmington with its docks, wharves and drawbridges as valid in a hilly or mountain section, such as Asheville or even Winston-Salem." 267 N.C. at 326, 148 S.E. 2d at 217. Subsequent to the filing of its decision in that case, the Supreme Court granted the railroads' petition for rehearing and modified its earlier opinion to emphasize that the railroads were not required to present evidence of revenue and costs at each switching yard in order to obtain a rate increase. 268 N.C. 204, 150 S.E. 2d 337 (1966). We conclude that the case relied upon by protestant does not stand for the proposition that regional unit cost data may not be offered in support of a proposed rate increase. The Court held only that evidence of cost must be shown to be representative of the actual cost of the service to be provided. Thus, the issue in the present case is not whether the carriers separated intrastate expenses from regional data, but whether there was competent, material and substantial evidence in view of the entire record to support the Commission's findings that evidence of systemwide costs is representative of North Carolina costs. If that finding is so supported, it is conclusive and binding on this appeal. *Utilities Commission v. Coach Co.*, 269 N.C. 717, 153 S.E. 2d 461 (1967).

The record, viewed as a whole, discloses the following: The existing scale of rates on crude earth was established in 1962 and was applicable to both interstate and intrastate traffic. Between 1962 and 1976 the rate increased only in accordance with general rate increases for all commodities. In the mid-1970's, for the purpose of determining the cost-revenue relationship with respect to movements of crude earth, the Manager of the Commerce, Marketing and Planning Division of the Southern Railway System requested Frank Spuhler, a Senior Cost Analyst with the Southern Freight Association, to furnish data showing variable and fully allocated costs of single line and joint line movements of crude earth within the Southern Region. The costs which Mr. Spuhler furnished represented Southern Region unit cost figures for 1973 computed on the basis of a computerized cost formula which took into account accounting, statistical, and special study data for the twelve Class I railroads in the South. Those 1973 figures were further indexed to April 1976 wage and price levels. The costs were figured based upon the use of general open hopper cars with a lading weight of seventy-five tons. That data showed that the existing single line and joint line rates failed to cover fully allocated costs in all mileage blocks in the tariff scale from 25 to 600 miles, and that at certain levels even the variable cost was not covered by the rates. Increases in rates were proposed on the basis of that data so as to provide a fairer return to the railroads. At the time of the hearing before the Commission, the proposed rates had been adopted for interstate traffic and for intrastate traffic in all other states in which Southern Railway operates.

Mr. Spuhler testified before the Utilities Commission that the systemwide data was representative of North Carolina costs. The twelve Class I railroads represented in the study are members of four "systems." Ten of those railroads are members of the two systems to which the railroads operating in North Carolina belong, the Southern System and the Family Lines. Of those ten railroads, only five actually operate within the State of North Carolina. Mr. Spuhler did testify, however, that the consolidation of the different railroads into systems results in uniformity of costs for railroads within each system. The railroads which are members of the two systems operating in North

Carolina pay the same crew wages under national agreement and incur similar costs for materials, fuel, and rails. Of the two railroads represented in the cost study data which are not members of the systems operating in North Carolina, there was evidence tending to show that one pays lower wages, which has the effect of lowering the costs in the study, and that the other's differences are of minimal effect. We hold that the record as a whole contains substantial, competent and material evidence to support the Commission's finding that the Southern Region unit cost data was representative of North Carolina costs.

[3] As to protestant's contention that the carriers were required to, but did not, present evidence of actual cost of the Boren Siding-Roseboro movement affecting protestant to support its proposed increase in rates, it is significant that respondents' burden in this particular case was to establish that the rates across the mileage scale, not merely the rate at the mileage level applicable to protestant, were just and reasonable. *See* G.S. 62-75. The issue before the Commission in this case was "fair treatment to a group or to a class." *Utilities Commission v. Gas Co., supra.* Thus, the appropriate group or class for the Commission's consideration was not Boren Clay Products as an individual shipper at the 100-mile level, but the class of all present and future shippers of crude earth who would be affected by the scale of rates, of which class Boren is a member. Although protestant emphasizes that at present it is the only shipper in this State to which the joint line rate for crude earth applies, such an emphasis ignores one of the principal goals of rate making: simplification of the rate structure. *See Utilities Comm. v. Edmisten, Attorney General,* 291 N.C. 424, 230 S.E. 2d 647 (1976). If carriers were required to consider each and every small difference in cost for each and every shipper, "then there would have to be as many different schedules or rates as there are shippers. Manifestly, such a procedure would be so heavy that it would fall because of its weight. Schedules would be for individuals, and not for the public." *Public Service Com. v. State Ex. Rel. Great N.R. Co.,* 118 Wash. 629, 633-634, 204 P. 791, 793, 25 A.L.R. 186, 189 (1922). Although protestant presented some evidence of cost savings in its individual movement, there was no evidence that these savings were substantially greater than those incorporated by the carriers into the computation of the overall scale of rates, and the Commission, in reviewing the

reasonableness of the proposed scale of rates in its entirety, properly considered respondents' evidence of average unit costs.

[4] Relying on the decision of our Supreme Court in *Utilities Commission v. Light Co., supra,* protestant contends that respondents were required to present evidence of an emergency or change of circumstances that does not affect the entire rate structure. Although the Supreme Court in *Light Co.* did define a "complaint proceeding" as one which deals with an "emergency or change of circumstances" which does not affect the entire rate structure of the utility, 250 N.C. at 431, 109 S.E. 2d at 261, neither statute nor case law requires the Commission to make a specific finding that an emergency or change of circumstances has occurred. Final orders of the Commission in proceedings before it are not within the doctrine of *stare decisis,* and the purpose of a complaint proceeding may often be to adjust a single rate or scale of rates which has previously been approved without the necessity of instituting a protracted general rate case. There was competent, material and substantial evidence in the present case showing that the existing scale of rates, while perhaps adequate at the time initially approved, had become unremunerative at various mileage levels such that respondents were unable to recover the fully allocated cost of providing rail service to shippers of crude earth. Such evidence is clearly sufficient to show a "change of circumstances" not affecting the entire rate structure.

[5] Apart from its challenge to the relevance of the systemwide cost data presented, protestant contends that respondents have circumvented the provisions of G.S. 62-145 which provides:

When there is more than one route between given points in North Carolina, and freight is routed or directed by the shipper or consignee to be transported over a shorter route, and it is in fact shipped by a longer route between such points, the rate fixed by law or by the Commission for the shorter route shall be the maximum rate which may be charged, and *it shall be unlawful to charge more for transporting such freight over the longer route than the lawful charge for the shorter route.* (Emphasis added).

The evidence presented before the Commission disclosed that while there is a 98-mile rail route by which crude earth could be moved from Boren Siding to protestant's Roseboro plant, the actual movement is by a routing of 151 miles. Although Boren is charged the rate at the 100-mile level on the applicable tariff, it contends that the new joint line rate which the Commission approved was formulated by respondents to cover their actual costs for the 151-mile route, thus violating G.S. 62-145 indirectly. It is clear that where a rate has been set for a short line distance, a carrier which unlawfully charges a shipper the rate at the longer mileage level may not present evidence that the rate for the longer route is just and reasonable. *Utilities Commission v. R.R.*, 249 N.C. 477, 106 S.E. 2d 681 (1959). The question with respect to protestant in the present case, however, is not whether the 151-mile rate is just and reasonable as applied, because the protestant is not being unlawfully charged that rate. Instead, the question is whether the lawful rate, the 100-mile rate which Boren is charged, along with the other rates across the entire mileage scale, is just and reasonable. The evidence tends to show that the cost computation for the Boren movement, although based on the costs for the 151-mile movement, was not made until after Boren protested the tariff filing and that the rate for the short line mileage was set on the basis of representative systemwide average unit cost data. Because the evidence amply supports the Commission's finding that the existing scale of rates, including the rate applicable to Boren, was unremunerative, Boren has no cause to complain under G.S. 62-145 where it is charged the "lawful" charge, the just and reasonable charge, for the shorter route.

[6] Protestant Boren next challenges the proposed rates as discriminatory, contending that the differential between joint and single line rates, and between rates for sand and gravel and those for crude earth, is injustifiably burdensome. To be valid, a rate differential must represent substantial differences in service or conditions: "There must be no unreasonable discrimination between those receiving the same kind and degree of service." *Utilities Commission v. Teer Co.*, 266 N.C. 366, 375, 146 S.E. 2d 511, 518 (1966), *accord, Utilities Com. v. Mead Corp.*, 238 N.C. 451, 78 S.E. 2d 290 (1953). Although prior to the Commission's approval of the proposed rate increase the differential between joint and single line rates was considerably less than after the

increase, respondents were not required to prove that the existing rates were no longer just and reasonable, but, instead, that the new rates in themselves were just and reasonable. *Utilities Comm. v. Edmisten, Atty. General,* 29 N.C. App. 428, 225 S.E. 2d 101, *aff'd,* 291 N.C. 424, 230 S.E. 2d 647 (1976). Although the tariff change which the Commission approved increased single line rates 7.17% and joint line rates 18.73%, respondents' evidence showed that joint line costs for a given movement will be higher than single line costs because of the necessity of interchange of equipment and additional billing. Given evidence of differing costs in providing service, it is not the function of the courts to determine that the Commission erroneously determined the rates to be reasonable. Although protestant contends that the Commission failed to make a specific finding of fact concerning the reasonableness of the discrimination between joint and single line rates as required by G.S. 62-79, we conclude that the hearing examiner's finding that the new rates on single and joint line movements will still not permit respondents' full recovery of cost adequately addresses the issue of discrimination and supports the Commission's ultimate conclusion that there is no undue discrimination in the proposed rates. Where the evidence showed inability of the carriers to recover cost even at the new approved rates, it is difficult to perceive that unreasonable discrimination against the protestant exists.

[7] Finally, as to the alleged discrimination between the approved rates and the existing rates on sand and gravel, the Commission based a conclusion that there was no undue discrimination on a finding that the proposed rate for the movement of crude earth from Boren Siding to Roseboro is $0.01 less than "like shipments of sand or gravel when handled in similar equipment, at the present Ex Parte level of rates." Protestant contends that this finding is erroneous because it is based on a comparison of the proposed joint line rate for crude earth at mileage level 100, $3.36 per net ton, with the joint line rate for sand and gravel after application of a general 4% rate increase, $3.37, which increase had been proposed by respondents but was rejected by order of the Utilities Commission dated 21 October 1976. This contention is without merit. Although the Utilities Commission did originally deny the proposed general

increase on intrastate rates, the Interstate Commerce Commission ruled on 29 September 1977 that, as a result of that denial, existing intrastate rates in North Carolina caused an unjust discrimination against and undue burden on interstate commerce. As a result of that ruling, the North Carolina Utilities Commission permitted the general increase to go into effect. Thus, when the final order granting a rate increase for movement of crude earth was issued on 2 August 1978 in the present case, the Commission properly took the general rate increase into account in comparing the joint line rates for sand and gravel with those for crude earth.

Reviewing the factual findings of the Commission, we find that the relevant issues of fact were addressed and that they fully support its conclusion that the rates at issue were just and reasonable. The order appealed from is

Affirmed.

Chief Judge MORRIS and Judge MARTIN (Harry) concur.