STATE OF NORTH CAROLINA, ex rel. UTILITIES COMMISSION; RUFUS L. EDMISTEN, ATTORNEY GENERAL; PUBLIC STAFF; HENRY J. TRUETT; TOWN OF BRYSON CITY; SWAIN COUNTY BOARD OF COUNTY COMMISSIONERS; CHEROKEE, GRAHAM AND JACKSON COUNTIES, THE TOWNS OF ANDREWS, DILLSBORO, ROBBINSVILLE, AND SYLVA; THE TRIBAL COUNCIL OF THE EASTERN BAND OF CHEROKEE INDIANS; MURIEL MANEY; AND DEROL CRISP v. NANTAHALA POWER AND LIGHT COMPANY; ALUMINUM COMPANY OF AMERICA; AND TAPOCO, INC.

No. 8210UC1034

(Filed 6 December 1983)

1. **Electricity § 3; Utilities Commission § 36— electric rates—affiliated utilities— use of energy generated by unified system rather than entitlements under agreements**

    Where the Utilities Commission found that Nantahala Power Co. and Tapoco, Inc. should be treated as one utility for ratemaking purposes, and where Nantahala, Tapoco, TVA and Alcoa had entered into agreements approved by the Federal Energy Regulatory Commission under which all power generated by Nantahala and Tapoco is to be delivered to TVA, certain annual demand and energy entitlements are granted to Nantahala and Tapoco, and Alcoa, Nantahala and Tapoco are to decide how the power will be divided between Nantahala and Tapoco, the Utilities Commission's use of the amount of energy generated by the unified system in setting Nantahala's rates to its retail customers rather than the energy received as entitlements under the agreements with TVA, Alcoa and Tapoco did not constitute a modification of such agreements and was proper.

2. **Electricity § 3; Utilities Commission § 36— electric rates—affiliated utilities— costs of energy—no violation of Commerce Clause**

    The Utilities Commission's method of determining the retail rates of Nantahala Power Co. on the basis of its percentage of the costs of the energy generated and purchased by the combined Nantahala-Tapoco system did not shift a portion of Nantahala's costs to its Tennessee customers in violation of the Commerce Clause of the U.S. Constitution. Art. I, § 8 of the U.S. Constitution.

3. **Electricity § 3; Utilities Commission § 57— independent finding by Utilities Commission—sufficiency of evidence**

    The Utilities Commission made an independent finding of fact not based on a prior Supreme Court decision in the case that energy demand and entitlement agreements entered into by Nantahala Power Co., Tapoco, Inc., TVA and

Alcoa resulted in substantial benefits to Alcoa to the detriment of Nantahala's customers, and such finding was supported by the evidence at a rate hearing although there was contrary evidence tending to show that the agreements were fair to Nantahala.

4. **Electricity § 3; Utilities Commission § 36— electric rates—affiliated companies —method of roll-in of properties, revenues and expenses**

     The Utilities Commission was not required by a Supreme Court opinion remanding this case to adopt a method of rolling in the properties, revenues and expenses of Tapoco, Inc. with those of Nantahala Power Co. which acknowledged apportionment agreements entered by Nantahala, Tapoco, TVA and Alcoa as controlling the allocation of costs and benefits in determining Nantahala's retail rates. Nor was the Commission required to make a distinction between firm power and curtailable power.

5. **Electricity § 3; Utilities Commission § 36— electric rates—affiliated utilities— roll-in of properties, revenues and expenses—failure to include power purchased by parent company**

     The Utilities Commission's roll-in of the properties, revenues and expenses of Tapoco, Inc. with those of Nantahala Power Co. for the purpose of determining Nantahala's retail rates was not erroneous because it included the power which Nantahala purchased from TVA but did not include the power which its parent company, Alcoa, purchased from TVA.

6. **Utilities Commission § 5— parent corporation as public utility—constitutionality of statute**

     The statute providing for the imposition of public utility status on certain parent corporations, G.S. 62-3(23), is not void for vagueness, since a person of ordinary understanding would know from reading the statute that if a parent corporation controls its wholly owned public utility in such a way that the rates of the utility are affected, this has an effect on the rates and the parent corporation could be found to be a public utility.

7. **Utilities Commission § 5— parent corporation as public utility—no delegation of legislative power**

     The statute providing for the imposition of public utility status on certain parent corporations, G.S. 62-3(23), does not delegate legislative power to the Utilities Commission in violation of Art. I, § 6 of the N.C. Constitution, since the legislature has given the Utilities Commission sufficient guidelines so that if the facts are properly found by the Commission, it does not make policy but carries out legislative policy.

8. **Electricity § 3; Utilities Commission § 36— extent of affiliation on rates—sufficiency of finding**

     A finding by the Utilities Commission that "Alcoa has so dominated certain transactions and agreements affecting its wholly owned subsidiary Nantahala that Nantahala has been left but an empty shell, unable to act in its own self interest, let alone the interest of its public utility customers in North Carolina" was a sufficient finding as to the extent Alcoa's affiliation with Nantahala had affected the rates of Nantahala within the purview of G.S. 62-3(23)c

so as to support the Commission's order that Alcoa must pay any portion of refunds to Nantahala's customers which Nantahala is financially unable to pay.

**9. Electricity § 3; Utilities Commission § 36— electric rates—responsibility of parent corporation for refunds—no retroactive ratemaking**

A Utilities Commission order requiring Alcoa to be responsible for a refund to customers of Nantahala Power Co. for a period of time prior to the time Alcoa was held to be a public utility did not constitute retroactive ratemaking.

**10. Electricity § 1; Utilities Commission § 5— Tapoco, Inc. as public utility**

The Utilities Commission properly found that Tapoco, Inc. is a public utility where the evidence showed that electricity generated by Tapoco is exchanged with TVA for power from TVA, since this constitutes furnishing electricity to TVA for distribution to the public within the meaning of G.S. 62-3(23)b.

**11. Electricity § 3; Utilities Commission § 36— electric rates—affiliated utilities— single electric system**

The Utilities Commission properly found that Nantahala Power Co. and Tapoco, Inc. constitute a single integrated electric system operated as a coordinated part of the TVA system where the evidence showed that the two companies traded all their generation to TVA and received from TVA entitlements to energy which they divide as they please.

**12. Electricity § 3; Utilities Commission § 47— general rate case—notice to parent of possible responsibility for subsidiary's refunds**

When Alcoa was held to be a public utility and was made a party to a general rate case, it received adequate notice that it might be held liable for a refund to retail customers of its wholly owned subsidiary, Nantahala Power Co.

**13. Utilities Commission § 44— general rate case—prefiling of testimony—time for filing brief**

The due process rights of Alcoa in a general rate case involving its wholly owned subsidiary, Nantahala Power Co., were not violated by the Utilities Commission's requirement that Alcoa prefile its testimony prior to the prefiling of the intervenors' testimony and that Alcoa file its brief concurrently with that of the intervenors.

**14. Utilities Commission § 36— electric rates—finding concerning affiliated companies—no shifting of burden of proof**

Although the Utilities Commission stated in its rate order that it had permitted Alcoa to introduce evidence "to challenge the findings of the Supreme Court" in a prior appeal of the case that Nantahala Power Co. and Tapoco, Inc. constituted a single electric system for ratemaking purposes, the Commission did not improperly shift the burden of proof to Alcoa where there was sufficient evidence to support the Commission's finding that Nantahala and Tapoco constituted a single system for ratemaking purposes without the use of any presumption against Alcoa.

15. **Electricity § 3; Utilities Commission § 36— electric rates—responsibility of parent for subsidiary's refunds—general rate case**

   A proceeding in which the Utilities Commission found Alcoa to be a public utility and ordered Alcoa to pay any portions of refunds which its wholly owned subsidiary, Nantahala Power Co., is financially unable to pay was properly conducted as a general rate case rather than as a complaint proceeding against Alcoa, since the responsibility of Alcoa for Nantahala's refund was ancillary to the case.

16. **Electricity § 3; Utilities Commission § 56— electric rates—order for refunds—compliance with prior Supreme Court decision**

   The Utilities Commission was following the mandate of the N.C. Supreme Court in a prior appeal of this case in ordering Nantahala Power Co. to "refund to its North Carolina retail customers all revenue collected under the rates approved by the Commission order issued June 14, 1977, to the extent that said rates produce revenue in excess of the rates approved herein."

17. **Electricity § 3; Utilities Commission § 36— electric rates—order requiring refunds—no confiscation of property**

   A Utilities Commission order providing for refunds to Nantahala Power Company's retail customers and requiring Nantahala's parent company, Alcoa, to pay any portion of the refunds which Nantahala is financially unable to pay did not confiscate the property of Nantahala in violation of its due process rights because Nantahala's refund obligation is more than its net worth, Alcoa has denied its obligation to pay, and it may be years before Alcoa has exhausted its remedies in federal court.

APPEAL by respondents from order of North Carolina Utilities Commission entered 2 September 1981. Heard in the Court of Appeals 25 August 1983.

This is an appeal from an order by the North Carolina Utilities Commission reducing rates and requiring a refund by Nantahala Power and Light Company and Alcoa. This case has previously been in the appellate courts. *See Utilities Comm. v. Edmisten, Attorney General*, 40 N.C. App. 109, 252 S.E. 2d 516 (1979), *aff'd in part and rev'd in part*, 299 N.C. 432, 263 S.E. 2d 583 (1980). Nantahala and Tapoco, Inc. are wholly owned subsidiaries of the Aluminum Company of America (Alcoa). Each of them is engaged in the generation of hydroelectric power in western North Carolina. Tapoco sells power to no one but Alcoa for the use of its aluminum manufacturing operations in Tennessee. Nantahala, which was organized in 1929, served the public until 1941 with a small amount of its power going to Alcoa. In 1941 with the advent of World War II, Nantahala accelerated the development

of its hydroelectric power to serve Alcoa's increased production of aluminum for the war effort. After the war, Alcoa continued buying power from Nantahala but the expanded demand by the public took increasing amounts of Nantahala's generation so that after 1971 Alcoa has not taken any power from Nantahala.

In 1941 Nantahala and Tapoco entered into an agreement with the Tennessee Valley Authority (TVA) known as the Fontana Agreement. Among other things, this agreement provided that the TVA would coordinate the water flow of the dams owned by Nantahala and Tapoco. The agreement was to last for 20 years. In 1962 the Fontana Agreement was replaced by the New Fontana Agreement (NFA). TVA, Alcoa, Nantahala and Tapoco are parties to the NFA. Under the terms of the NFA, all power generated by Nantahala and Tapoco is delivered to TVA. TVA grants to Nantahala and Tapoco annual entitlements to some 1,798,000,000 kwh. The NFA provides that Alcoa, Nantahala and Tapoco will decide how the power will be divided between Nantahala and Tapoco.

In 1963 an agreement was made by the three parties under the terms of which Nantahala was to receive as its monthly share of the NFA entitlements the larger of either its total actual generation or 30,000,000 kwh. This agreement provided further that Alcoa was to pay Nantahala an annual sum of $89,200 in compensation for allowing TVA to control the flow of water through Nantahala's dams.

In 1971 a new apportionment agreement was made. Under this agreement Nantahala received 360 million kwh annually. The $89,200 annual payment from Alcoa was eliminated and Nantahala purchased from TVA any additional power it needed for its customers. In 1975, the test year for this case, Nantahala purchased slightly more than 90 million kwh from TVA for which it paid over $1.5 million dollars. Nantahala generated in excess of 520 million kwh in that year.

The Utilities Commission first refused to join Alcoa and Tapoco as parties and denied a motion to compel Nantahala to produce information sufficient to allow the Commission to consider a rate design based on the "rolling in" of Tapoco's properties, revenues and expenses with those of Nantahala, as though the two were operating as one utility. This Court reversed. Our

Supreme Court affirmed in part the decision of this Court and ordered the case remanded to the Utilities Commission with directions that it consider whether a rate schedule computed as if Nantahala and Tapoco were one utility would be in the best interests of the customers of Nantahala.

After the remand from the Supreme Court, the Utilities Commission held further hearings. Alcoa and Tapoco were made parties to the proceedings and were held to be public utilities. The Commission found that the NFA and the 1971 Apportionment Agreement have resulted in substantial benefits to Alcoa to the significant detriment of the retail customers of Nantahala, and that the Nantahala and Tapoco systems should be treated as one entity with respect to all matters affecting the determination of Nantahala's reasonable cost of service applicable to its North Carolina retail operations.

In calculating the costs of power to Nantahala's retail customers, the Utilities Commission did not use the NFA or 1971 Apportionment Agreement. It used instead the total generation of Nantahala and Tapoco plus the power purchased from TVA by Nantahala. It allocated Nantahala's share of demand related costs by dividing the total dependable capacity of the two systems plus the power purchased from TVA into Nantahala's peak load during the test year. The result was 24.60% which the Commission assigned to Nantahala as its percent of the total system demand costs. It calculated Nantahala's share of energy related costs by dividing total average energy available from the unified system plus Nantahala's purchase from TVA into Nantahala's energy requirements for 1975. This gave a result of 24.51% which the Commission assigned to Nantahala as its share of energy costs for the unified system.

The Commission ordered that Nantahala reduce its rates and refund to its North Carolina retail customers all revenue collected under the Commission's order issued 14 June 1977 to the extent said rates produced revenue in excess of the rates allowed by the Commission in this proceeding. It ordered further that to the extent Nantahala is financially unable to make the refunds required in the Commission's order, Alcoa shall make such refunds.

Alcoa, Nantahala and Tapoco appealed.

State ex rel. Utilities Comm. v. Nantahala Power & Light Co.

*Attorney General Edmisten, by Assistant Attorney General Richard L. Griffin, for the State.*

*Crisp, Davis, Schwentker and Page, by William T. Crisp and Robert B. Schwentker, for Henry J. Truett, the Counties of Cherokee, Graham, Swain, and Jackson; the Towns of Andrews, Dillsboro, Robbinsville, Bryson City and Sylva; and the Tribal Council of the Eastern Band of the Cherokee Indians.*

*Robert Fischbach, Executive Director of The Public Staff, by Staff Attorney Thomas K. Austin, for the Using and Consuming Public.*

*Joseph A. Pachnowski for the Town of Bryson City.*

*Western North Carolina Legal Services, Indian Law Unit, by Larry Nestler, for Muriel Maney and Derol Crisp.*

*Fred H. Moody, Jr. for the County of Swain.*

*Hunton and Williams, by Robert C. Howison, Jr., James E. Tucker, Edward S. Finley, Jr., and William C. Matthews, Jr., for Nantahala Power and Light Company.*

*LeBoeuf, Lamb, Leiby and MacRae, by Ronald D. Jones and David R. Poe, for Aluminum Company of America and Tapoco, Inc.*

WEBB, Judge.

**[1]** Nantahala and Tapoco first attack the methodology used by the Utilities Commission in establishing the charge to Nantahala's retail customers. They argue that the Commission is required by law to recognize the NFA and the 1971 Apportionment Agreement in setting rates for Nantahala's retail customers. They say this is so because both of these agreements have been filed with and approved by the Federal Energy Regulatory Commission (FERC) and the Utilities Commission is preempted by federal law from ignoring them. The Utilities Commission in setting retail rates has to give effect to wholesale rates established by the FERC. *See F.P.C. v. Southern California Edison Co.,* 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed. 2d 638, *reh'g denied, F.P.C. v. Southern California Edison Co.,* 377 U.S. 913, 84 S.Ct. 1161, 12 L.Ed. 2d 183 (1964); *Public Service Co. of Colorado v. P.U.C. of Colorado,* 644 P.

2d 933 (Colo. 1982); *People's Counsel of D.C. v. P.S.C. of D.C.*, 444
A. 2d 975 (D.C. Ct. App. 1982); *Northern States Power Co. v.
Hagen*, 314 N.W. 2d 32 (N.D. 1981); *Narragansett Electric Co.
v. Burke*, 119 R.I. 559, 381 A. 2d 1358 (1977), *cert. denied, Burke v.
Narragansett Electric Co.*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed. 2d
63 (1978); *Citizens Gas Users Ass'n. v. Public Utilities Comm.*, 165
Ohio St. 536, 138 N.E. 2d 383 (1956); *City of Chicago v. Illinois
Commerce Comm.*, 13 Ill. 2d 607, 150 N.E. 2d 776 (1958); and
*United Gas Corp. v. Mississippi P.S.C.*, 240 Miss. 405, 127 So. 2d
404 (1961). Nantahala and Tapoco contend that when the Utilities
Commission, in setting retail rates for Nantahala, refused to use
the demand and energy entitlements which Nantahala received
under the NFA and the 1971 Apportionment Agreement, the
Commission modified these two agreements which it does not
have the power to do.

We believe the resolution of this case largely depends on a
proper analysis of the NFA and the 1971 Apportionment Agree-
ment as affected by the order of the Utilities Commission. The
Commission's order does not change the energy entitlements
received by Nantahala and Tapoco under the NFA and the 1971
Apportionment Agreement. Each receives its share of the power
and uses it as received. The question is whether by not using
these two agreements in setting Nantahala's rates the Utilities
Commission has changed the agreements, which it does not have
the power to do.

When the Utilities Commission determined that Nantahala
and Tapoco should be treated as one company for rate-making
purposes, it was faced with the question of what constituted a
proper charge to Nantahala's retail customers for the power used
by them. The Utilities Commission resolved this question by
assigning to Nantahala's retail customers a demand charge based
on the percentage used by Nantahala of the firm energy
generated and purchased by the unified system during the test
year. It calculated the energy charge using the same method, that
is, it assigned to Nantahala's customers the percentage needed
for their own energy requirements out of the total energy
generated and purchased by the unified system.

The amount of energy generated by the unified system was
not the same as the energy Nantahala received as entitlements.

Therefore the question is whether the Commission has changed the NFA and the 1971 Apportionment Agreement by using generation rather than entitlements under the agreements in calculating retail rates for Nantahala. We believe by requiring Nantahala's retail customers to pay demand and energy charges based on Nantahala's percent of the demand and energy requirements from the capacity of the entire system the Utilities Commission has used a methodology we cannot disturb. The methodology calculates the cost of the generation which the unified system trades to TVA for the electricity used by the system. In whatever form the entitlement comes to Nantahala-Tapoco, Nantahala's customers should only be charged for Nantahala's share of the costs of what was traded for the entitlements. We do not believe the methodology used by the Utilities Commission changes the NFA or the 1971 Apportionment Agreement.

Nantahala and Alcoa also argue that Tapoco's four hydroelectric plants have been licensed by the FERC for the express purpose of supplying power to Alcoa's Tennessee operations and that by directing a part of Tapoco's power to Nantahala's customers, the order of the Utilities Commission has imposed a condition on a federal license to operate their plants which it may not do. *See First Iowa Hydro-Electric Cooperative v. F.P.C.*, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143, *reh'g denied*, 328 U.S. 879, 66 S.Ct. 1336, 90 L.Ed. 1647 (1946). We do not believe the Commission's order diverts power from Tapoco to Nantahala. The order fixes the costs to Nantahala for the power it receives through the NFA and the 1971 Apportionment Agreement.

[2] Nantahala and Alcoa contend that the order of the Commission places an impermissible burden on interstate commerce in violation of Article I, § 8 of the United States Constitution. The Commission recited in its order that "Nantahala-Tapoco combined system's North Carolina public load has first call on the total electric energy output of the combined system, and to the extent that said output exceeds the requirements of the North Carolina public load, such excess will be available for sale and will be purchased by Alcoa." Nantahala and Tapoco argue that it is a violation of the Commerce Clause to prefer the residents of one state over the residents of another state; and after stating it would do this, the Utilities Commission did so by the methodology it used

in setting Nantahala's retail rates. They argue that this methodology reduced Nantahala's rates below its costs and shifted these costs to the combined system's Tennessee load.

If the Utilities Commission had used a methodology that gave "first call" to the North Carolina customers it would violate the Commerce Clause. In spite of its recital, we do not believe the Utilities Commission did this. We believe that the methodology used by the Commission allows Nantahala to recover the costs of the percentage of energy it used based on its percentage of the costs of the energy generated and purchased by the combined system. We do not believe this prefers North Carolina customers over Tennessee customers.

Nantahala and Tapoco say that an illustration of the shifting of costs to out-of-state customers may be found in the way the demand cost allocation factor for Nantahala is calculated. Based on Nantahala's peak load which was 24.6% of the total firm capability of the combined system, the Commission assigned 24.6% of the demand costs to Nantahala. Nantahala and Tapoco point out that Tapoco's peak load was only 44.9% of the total firm capability of the combined system. They say that Tapoco is thus required to shoulder 75.4% of the demand costs, 30% more than its responsibility. We believe that in determining Nantahala's reasonable demand cost, the Commission was not required to assure the recovery of 100% of the demand costs incurred in the combined system. Nantahala's customers should not be required to pay more for demand than that for which they are responsible, even if it means that all the combined system demand costs are not recovered. *See Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972), *superseded by statute, Utilities Comm. v. Power Co.*, 305 N.C. 1, 287 S.E. 2d 786 (1982).

Nor do we believe *New England Power Co. v. New Hampshire*, 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed. 2d 188 (1982) governs this case. It was said in that case that "Our cases consistently have held that the Commerce Clause of the Constitution, Art. I, § 8, cl. 3, precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *Id.* at 338, 102 S.Ct. at 1100, 71 L.Ed. 2d at 197. The facts of that case are distinguishable from this case. In

that case the Supreme Court held that it was an impermissible burden on interstate commerce for the New Hampshire Public Utilities Commission to require a power company generating hydroelectric power in New Hampshire to sell an amount of power in New Hampshire at hydroelectric rates equal to the amount of hydroelectric power it generated in New Hampshire. In this case the Utilities Commission has set a rate for Nantahala-Tapoco based on the cost of producing the power.

Alcoa argues that it, Nantahala and Tapoco are regulated by TVA; that TVA has approved the NFA and the 1971 Apportionment Agreement, and the Utilities Commission cannot refuse to give effect to these agreements. As we have said, we do not believe the Utilities Commission has refused to give effect to these agreements. It has calculated the costs to Nantahala's customers of the power delivered to them under the agreements.

Alcoa also argues that the relationship between Alcoa, Nantahala and Tapoco is regulated by the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935 and the SEC has granted the companies an exemption from some of the requirements of the Act. We do not believe the order of the Utilities Commission has in any way affected the order of the SEC as to the three companies.

[3] Nantahala assigns error to the Commission's finding of fact that the NFA and the 1971 Apportionment Agreement resulted in substantial benefits to Alcoa to the detriment of Nantahala's customers. Nantahala argues first that the Commission made no finding of fact that the two agreements were unfair to Nantahala's customers but erroneously assumed our Supreme Court had found as a fact that they are unfair. It argues further that the only evidence at the hearing after the Supreme Court's remand is that the agreements were fair. The Supreme Court questioned the fairness of an agreement which required Nantahala to purchase additional power regardless of the adequacy of its own generation. Nantahala's witness testified that the only valid way to compare generation is on an hour-by-hour basis, that a hydroelectric power plant can generate more power than its customers use during a year, but if the power cannot be generated when there is a demand for it, the power generated during the period when it is not needed· is useless. Nantahala's

witness testified this was the case for Nantahala during the test year and for that reason, Nantahala benefited from the firm power it received under the NFA and 1971 Apportionment Agreement. Nantahala also contends that the Commission did not address the evidence that during the 12-month period from June 1980 through May 1981, Nantahala's generation was less than its entitlement under the NFA and the 1971 Apportionment Agreement. Finally, Nantahala contends no consideration was given to the substantial benefits Nantahala's customers have received since 1941 because of the presence of Alcoa. Nantahala argues that the uncontradicted evidence shows that the NFA and 1971 Apportionment Agreement are fair to Nantahala's customers and the Commission should have so found.

We believe the Utilities Commission made an independent finding of fact that the NFA and the 1971 Apportionment Agreement were unfair to Nantahala's customers. We believe a reading of our Supreme Court's opinion in the previous appeal in this case leaves little doubt that they considered the NFA and the 1971 Apportionment Agreement unfair to the customers of Nantahala. We cannot hold because of this, however, that the Commission's finding of fact on this issue, which we believe was supported by the evidence, was not independently made. The Commission did not comment on all the evidence as to the fairness of the two agreements but it was not required to do so.

The Commission relied on evidence that in 1963 an agreement had been made under which Nantahala received a minimum of 360,000,000 kwh annually plus its actual production in excess of 360,000,000 kwh. This allocation was based on engineering studies which showed that under the most adverse water conditions Nantahala could generate 360,000,000 kwh annually with the average energy that could be generated annually to be 439,000,000 kwh per year. Under the 1971 Apportionment Agreement, Nantahala received only 360,000,000 kwh per year. The additional power which Nantahala had received under the 1963 agreement went to Tapoco and was passed on to Alcoa. There was evidence that the peaking capacity allotted Nantahala under the 1971 Apportionment Agreement is less than its actual capacity. This results in Nantahala having to pay a demand charge to TVA when Nantahala's customers demand is less than Nantahala's capacity. Nantahala's dams are upstream from Tapoco's dams. This means

Nantahala can store water during the winter months and, by releasing it in dry seasons, can provide water for Tapoco. This benefit to Tapoco was not taken into account in the 1971 Apportionment Agreement.

The Commission also relied on evidence that under the 1941 Fontana Agreement, Nantahala gave TVA the right in perpetuity to control the storage and flow of water from its hydroelectric projects. This constituted a loss of considerable value to Nantahala which the TVA recognized in the return entitlements of the NFA. Nantahala was paid $89,200 per annum by Alcoa for this loss under the 1963 agreement but received nothing for it under the 1971 Apportionment Agreement. There is evidence in the record which shows it is some benefit to TVA for Nantahala to be integrated into the TVA system. TVA recognized this in the NFA but no benefits were given to Nantahala in the 1971 Apportionment Agreement for this right.

There was evidence that the NFA is unfavorable to Nantahala in that it is structured to meet Alcoa's needs and not the needs of Nantahala. This is so because the return entitlement is structured to meet Alcoa's demand for a certain amount of stable electricity for purposes of aluminum production. It is not structured to meet Nantahala's need for peaking capacity which a utility with a public service load requires. Nantahala has a need for assured, but constantly variable amounts. It has this peaking capacity but it does not receive it under the NFA. We believe this evidence supports the Commission's finding of fact that the NFA and the 1971 Apportionment Agreement resulted in substantial benefits to Alcoa to the significant detriment of Nantahala's customers. There was substantial evidence that the two agreements were fair but this evidence was by no means uncontradicted. We cannot disturb this finding by the Utilities Commission.

[4] Nantahala contends that the Utilities Commission did not adopt a roll-in methodology within the scope of the remand by our Supreme Court. They argue that the Supreme Court envisioned a roll-in methodology which acknowledges the terms of the NFA and the 1971 Apportionment Agreement. Nantahala argues that the Supreme Court intended that the two agreements should be considered as valid and should control on the allocation of costs

and benefits on all matters to which they applied. Nantahala also argues that the methodology erroneously fails to draw any distinction between the value of firm power on the one hand and curtailable power on the other. Nantahala argues that curtailable power is of almost no value to a utility serving a public load because the public will not accept services that may require even short periods of darkness or lack of heat. Under the 1971 Apportionment Agreement, Nantahala received virtually all the firm power entitlements and Tapoco virtually all of the curtailable entitlements. Tapoco then had to pay TVA in order for TVA not to curtail power to Tapoco. Nantahala argues this should have been taken into account when adopting a roll-in methodology.

We do not agree that the Utilities Commission was required by the opinion of the Supreme Court to use a roll-in methodology that acknowledges the NFA and 1971 Apportionment Agreements as controlling as to costs and benefits. The Supreme Court did not prescribe a formula for a roll-in. In discussing the NFA and the 1971 Apportionment Agreement which the Court felt required Nantahala to purchase extra power for its customers although it generated sufficient power for them, the Court said that to suggest such an arrangement fairly served the customers of Nantahala "assaults the common sense of this Court." In light of this language by the Supreme Court, we do not feel its opinion requires the roll-in to be based on the NFA and 1971 Apportionment Agreement. It is true that the Supreme Court did not consider the federal questions in its opinion. We believe the Utilities Commission stayed within the mandate of the Supreme Court and it violated no federal law in so doing. The Utilities Commission was not required to consider payments made by Tapoco to prevent the curtailment of power because this did not occur in the test year.

Alcoa also contends that the roll-in applied by the Utilities Commission is not in conformity with the opinion of the Supreme Court. Alcoa points out that the Supreme Court's concern was with the fact that Nantahala did not receive the fair economic equivalent of what its generating plants were capable of producing as a result of which Nantahala was forced to purchase expensive TVA power. Alcoa argues that an analysis of the NFA and the 1971 Apportionment Agreement shows that Tapoco and Alcoa did not receive any hidden benefits from them. The unified

system did not receive as much in the entitlements as the system generated and Alcoa says this is because Nantahala's harvests of energy are neither as regular nor abundant as the Supreme Court was led to believe. This is because there is a substantial mismatch in the times at which the power is generated and the times it is needed. For this reason, TVA was not willing to give an entitlement of firm power equal to the generation of the unified system. Alcoa argues that the analysis which the Commission should have made and failed to do was whether the division of the entitlements between Nantahala and Tapoco was equitable. It says that any study of the division of these entitlements shows that Tapoco faired far worse than Nantahala in that it received less power in return for its contribution than did Nantahala. The Commission did analyze the 1971 Apportionment Agreement as well as the NFA as pointed out in another part of this opinion. It came to the conclusion that they were unfair to Nantahala's customers. We might reach a different conclusion but it is not for us to dictate to the Utilities Commission the weight to give material facts before it. We believe the weight the Commission gave to these facts was within the requirements of the Supreme Court's opinion.

[5]   Alcoa also objects to the roll-in because it includes the power which Nantahala purchased from TVA but does not include the power which Alcoa purchased from TVA. We believe the Commission was correct in not considering the power purchased by Alcoa from TVA. The Commission's task was to determine the part Nantahala's retail customers should be required to pay for their share of the energy received by the unified Nantahala-Tapoco system under the NFA and purchased from TVA. They should not be required to pay for energy purchased by Alcoa outside the unified system.

Alcoa assigns error to the Commission's finding that Alcoa is a public utility and its requirement that Alcoa pay any portion of the refunds which Nantahala is financially unable to make. The Utilities Commission found Alcoa to be a public utility pursuant to G.S. 62-3(23)c which provides:

The term "public utility" shall include all persons affiliated through stock ownership with a public utility doing business in this State as parent corporation or subsidiary corporation

as defined in G.S. 55-2 to such an extent that the Commission shall find that such affiliation has an effect on the rates or service of such public utility.

Alcoa attacks this portion of the Utilities Commission's order on three grounds. It says (1) G.S. 62-3(23)c is unconstitutional for vagueness, (2) it constitutes an unlawful delegation of legislative authority, and (3) the Commission misinterpreted and misapplied this section of the statute.

[6]  Under the due process clause of the Fourteenth Amendment to the United States Constitution, a statute is void for vagueness if its terms are so vague, indefinite and uncertain that a person cannot determine its meaning and therefore cannot determine how to order his behavior so as to avoid its dictates or avoid its application. *See Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) and *State v. Poe*, 40 N.C. App. 385, 252 S.E. 2d 843, *cert. denied*, 298 N.C. 303, 259 S.E. 2d 304 (1979), *appeal dismissed*, 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed. 2d 782 (1980). Alcoa argues that the legislature has failed to define what the effect on rates or services is necessary to impose public utility status on a parent corporation, and there is thus no guidance for the Commission as to whether Alcoa has had an effect on Nantahala. It argues further that a reading of the statute gives no indication of the parent company actions that the legislature was attempting to control or eliminate. We believe a person of ordinary understanding would know from reading the statute that if a parent corporation controls its wholly owned public utility in such a way that the rates of the utility are affected this has an effect on the rates and the parent corporation could be found to be a public utility. This prevents this section of the statute from being void for vagueness.

[7]  Alcoa contends that G.S. 62-3(23)c violates Article I, § 6 of the North Carolina Constitution because it delegates legislative power to the Utilities Commission. It says this is so because it is a legislative decision as to what shall be a public utility and that by enacting this section of the statute, the legislature has allowed the Commission to determine what corporations shall be designated public utilities and how they shall be regulated without adequate legislative standards to guide the Commission. We believe, without discussing all the hypothetical situations that on

the facts of this case there has not been a delegation of legislative authority. In order to find that Alcoa is a public utility, the statute required the Utilities Commission to find that Alcoa was so affiliated with Nantahala as to have an effect on Nantahala's rates. The Commission so found and we believe this finding was supported by the evidence. We believe that the General Assembly has given the Utilities Commission sufficient guidelines so that if the facts are properly found by the Commission, it does not make policy but carries out legislative policy. By the same token when the Utilities Commission determined that Alcoa is a public utility we believe it was legislative policy and not the Commission's policy under which the Commission required Alcoa to be responsible for a part of the refund.

[8]  Alcoa also contends the Utilities Commission has misinterpreted and misapplied G.S. 62-3(23)c. It argues that since the section contains the words "to such an extent," the Commission may only regulate to the extent of the precise impact Alcoa has had on the rates of Nantahala. It argues that the Utilities Commission did not attempt to determine the extent to which Alcoa's relationship with Nantahala has affected Nantahala's rates and services and thus did not comply with the mandate of G.S. 62-3(23)c. Assuming that Alcoa is correct in this argument the Commission found the following: "Alcoa has so dominated certain transactions and agreements affecting its wholly owned subsidiary Nantahala that Nantahala has been left but an empty shell, unable to act in its own self interest, let alone the interest of its public utility customers in North Carolina." We believe this finding by the Commission is sufficient as to the extent Alcoa's affiliation with Nantahala had affected the rates of Nantahala so as to support the order of the Commission.

[9]  Alcoa also contends the Commission has engaged in retroactive ratemaking which it does not have the power to do. *See Utilities Commission v. City of Durham*, 282 N.C. 308, 193 S.E. 2d 95 (1972). It says this is so because the rates established in this proceeding are for the period from July 1977 through August 1981 and Alcoa was not held to be a public utility until October 1980. Alcoa argues that to make it responsible for a refund prior to the time it was declared a public utility is retroactive ratemaking. Retroactive ratemaking occurs when a rate is set so as to permit collection in the future for expenses attributable to past

services. Alcoa was made responsible for a refund ordered for Nantahala for the period in question in this proceeding. We do not believe that it is retroactive ratemaking for Alcoa to be held responsible for a refund. The fact that it was not made a party to the proceeding until after the remand from the Supreme Court makes no difference.

[10] Tapoco assigns error to the Utilities Commission's finding that it is a public utility. The Commission found that Tapoco was a public utility under G.S. 62-3(23)a which provides a "person" is a public utility if it generates electricity for sale to the public. It also found Tapoco to be a public utility under G.S. 62-3(23)b which provides:

> The term "public utility" shall for rate-making purposes include any person producing, generating or furnishing any of the foregoing services to another person for distribution to or for the public for compensation.

The Commission advanced as a third reason for finding Tapoco to be a public utility that it had obtained from the Utilities Commission in 1955 a certificate of public convenience and necessity. The Commission found as a fourth reason for holding Tapoco is a public utility was that its articles of incorporation state that one of its purposes is to produce and provide electric power to the public and provide it with the powers of eminent domain.

We do not decide whether the Commission was correct in holding Tapoco to be a public utility as provided by G.S. 62-3(23)a because it holds a certificate of public convenience and necessity or because its articles of incorporation state that one of its purposes is to generate electricity for sale to the public. We do not believe that determination is necessary for a decision in this case. We believe the evidence is sufficient to find Tapoco is a utility for ratemaking purposes. Tapoco's generation is exchanged with TVA for power from TVA. We believe this constitutes furnishing electricity to TVA for distribution to the public for compensation. This would make Tapoco a public utility for ratemaking purposes. Although the Utilities Commission did not set a rate for Tapoco, the price Tapoco charges for electricity will be affected by the outcome of this case. We hold that for this case Tapoco is a utility for ratemaking purposes and is a proper party to the case.

Tapoco also contends that the decision of the FERC in *Town of Highlands v. Nantahala Power and Light Company*, 19 F.E.R.C. (CCH) ¶ 61 (14 May 1982), holding that Nantahala and Tapoco should not be treated as one utility for ratemaking purposes, is binding on this Court. The FERC, while holding that it would not roll-in the costs of the two companies, held that the 1971 Apportionment Agreement was unfair in that Nantahala does not receive under it the energy in proportion to its contribution under the NFA. We do not believe the action of the Utilities Commission in this case is inconsistent with the decision of the FERC. The FERC was passing on wholesale rates and did not attempt to set retail rates in North Carolina.

[11] Tapoco argues that the Commission's finding that Nantahala and Tapoco constitute a single integrated electric system operated as such by and as a coordinated part of the TVA system is arbitrary and capricious and not based on substantial evidence. It argues that the evidence shows that the two companies operate independently of each other, that they serve different customers and are regulated by different agencies. Finally, Tapoco argues that the historical development of the two companies is such that they cannot be considered one integrated system. These facts may have been sufficient for the Commission to have found that the two companies were not a single, integrated electric system but there were other facts. The two companies traded all their generation to TVA and received in exchange for this entitlements of energy which they divide as they please. We believe the Commission could conclude from these facts that the two companies constitute a single, integrated system for ratemaking purposes.

Tapoco also argues the Commission did not properly consider the evidence because it gave too much weight to what it called the findings of the Supreme Court. Tapoco points out that the Supreme Court cannot make findings of fact and for the Utilities Commission to refer to findings by the Court, which "findings" were made before Tapoco was a party to the proceedings is error. Tapoco argues that no weight should be given to this language of the Supreme Court. Although the Utilities Commission referred to some of the statements in the Supreme Court's opinion as findings we believe the Commission made its own findings based on competent evidence which we cannot disturb.

Finally, Tapoco argues that it was denied due process of law in the manner in which the hearing was conducted. It contends that it was entitled to notice as to the effect of holding it to be a public utility. It says that to hold it to be a public utility without defining what its duties would be in the future, thus leaving it with a Damoclean sword over its head, deprives it of due process. We have affirmed the holding of the Utilities Commission to the extent that Tapoco is held to be a public utility for purposes of this case and bound by any order entered in this case. We do not believe this leaves a Damoclean sword over the head of Tapoco.

[12] Alcoa argues that it was denied due process for several reasons. It says first that it was not given adequate notice of what it would be required to defend. It contends it was not put on notice that it might be required to be responsible for a part of the refund until the issuance of the Commission's order on 2 September 1981. Alcoa argues that the failure to be notified of what the issues would be deprived it of due process of law. *See Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938). In this case Alcoa was made a party to the proceedings and held to be a public utility by order of the Commission on 3 October 1980. We believe that when Alcoa was held to be a public utility and made a party to a general rate case this was adequate notice that it might be held liable for the refund.

[13] Alcoa also contends its due process rights were violated by requiring it to prefile its testimony prior to the prefiling of the intervenors' testimony and requiring it to file its brief concurrently with the intervenors. It argues that it had a right to know what the contentions of the intervenors would be with a chance to meet them which it did not have under the procedure used by the Utilities Commission. Alcoa argues that it did not know the position of the intervenors as to the hidden benefits to Alcoa under the NFA and the 1971 Apportionment Agreement until the intervenors' brief was filed with the Utilities Commission at which time it did not have a chance to meet these contentions. We believe that in a general rate case to which Alcoa was a party and in which the NFA and the 1971 Apportionment Agreement were integral parts of the case Alcoa should have been forewarned that the intervenors intended to show the agreements were beneficial to Alcoa at the expense of Nantahala's customers. We hold the

procedure by which the Commission required Alcoa to prefile its testimony and its brief did not violate its due process rights.

Alcoa next contends it was deprived of due process by the Commission's consideration of evidence introduced at the hearings before it was made a party. There was sufficient evidence introduced at the hearings to which Alcoa was a party to support the Commission's findings of fact. We assume the Commission relied on this evidence.

[14] Alcoa next contends that the Utilities Commission improperly shifted the burden of proof. In its order the Utilities Commission made the following statement:

> These findings by the Supreme Court, that Nantahala and Tapoco constitute a single, integrated electric system and should be treated as one system for rate-making purpose [sic], have been carefully considered by the Commission for purposes of this proceeding. However, since Alcoa and Tapoco were not parties to the original proceeding that led to the June 14, 1977 Order, the Commission has allowed them and Nantahala to introduce evidence in the remand proceeding to challenge the findings of the Supreme Court.

Alcoa argues that by treating statements in the Supreme Court's opinion as findings of fact and requiring it to challenge them, the Commission placed a burden of proof on Alcoa which constitutes error. We do not believe we can hold the Utilities Commission placed the burden of proof on Alcoa. It did not say that it did so and there is sufficient evidence for the Commission to find the facts as it did without the use of any presumption against Alcoa. It is unfortunate that the Utilities Commission used the language it did since the Supreme Court did not and could not find facts. Nevertheless, we do not believe this language requires us to reverse the Utilities Commission.

[15] Alcoa's last argument is that the Commission violated its own rules by conducting the hearing as a general rate case and not as a complaint proceeding against Alcoa without the procedural rules of a complaint proceeding which could have given a different result. We believe the Utilities Commission was correct in conducting the proceeding as a general rate case. The primary question was what is a fair rate of return on Nantahala's invest-

ment so as to enable it by sound management to pay a fair profit to its stockholders and to maintain and expand its facilities and services in accordance with the reasonable requirement of its creditors. This would make it a general rate case. *See Utilities Comm. v. Gas Co.*, 259 N.C. 558, 131 S.E. 2d 303 (1963). The responsibility of Alcoa for Nantahala's refund was ancillary to the case.

[16] Nantahala assigns error to the Commission's requirement that it "refund to its North Carolina retail customers all revenue collected under the rates approved by Commission order issued June 14, 1977, to the extent that said rates produce revenue in excess of the rates approved herein." It argues that neither G.S. 62-132 nor G.S. 62-135 authorizes the Utilities Commission to order this refund. The opinion of our Supreme Court contains the following language:

> "We believe that essential fairness to all the parties is best served by allowing the increased rates to remain in effect, conditional upon Nantahala's guarantee that it will in the future refund to its customers any overcharges should the new rates ultimately be deemed excessive. Accordingly, we . . . direct the Commission to obtain adequate assurances of Nantahala's willingness and continued ability to refund such overcharges as may ultimately result from imposition of the 1977 rate schedule." *Utilities Comm. v. Edmisten, Attorney General*, at 444, 263 S.E. 2d at 592.

We believe the Utilities Commission was following the mandate of the Supreme Court in this portion of the order. We would have to overrule the Supreme Court to sustain this assignment of error, which we cannot do.

[17] Finally, Nantahala argues that the order of the Commission confiscates the property of Nantahala and thus violates its due process rights. It contends that its refund obligation is more than its net worth and although Alcoa was ordered to pay so much of the refund obligation as Nantahala cannot pay and remain solvent. Alcoa denies its obligation to pay. Nantahala says it may be years before Alcoa has exhausted its remedies in federal court and in the meantime Nantahala will not be able to serve its customers if it is responsible for the refund. It argues that such an order cannot be in the best interests of its customers.

We have affirmed the order as being within the mandate of our Supreme Court's opinion. We do not believe Nantahala's due process rights have been violated. The Utilities Commission has ordered that Alcoa be responsible for a part of the refund. We do not believe we should hold that Alcoa will not pay it and Nantahala will have to pay the entire refund, leaving it bankrupt.

We believe the Utilities Commission has conducted hearings and entered an order within the mandate of the Supreme Court's opinion. The appellants make persuasive arguments, particularly as to the equities involved. Indeed a good argument could be made that the best friend Nantahala's customers have is Alcoa. It financed the building of large hydroelectric facilities at a time when Nantahala could not have justified constructing them for its public customers. Nantahala's customers have had for many years the benefit of these facilities built at 1941 costs. Nevertheless, these are not factors which the law allows to be taken into account in setting utility rates.

Affirmed.

Judges ARNOLD and BRASWELL concur.